605 A.2d 921 (1992)
In re M.N.M.,
M.J.L., Appellant.
No. 90-1395.
District of Columbia Court of Appeals.
Argued November 25, 1991.
Decided March 27, 1992.
Harvey Schweitzer, with whom James A. Shrybman and Edith R. Blackwell were on the brief, for appellant.
Stanton Phillips for appellees.
*922 Before SCHWELB and FARRELL, Associate Judges, and GALLAGHER, Senior Judge.
FARRELL, Associate Judge:
In this appeal we face once again a challenge by the putative natural father (appellant) to a final decree of adoption entered even though, as the trial judge acknowledged, "the natural father was given no notice of the adoption proceedings." The judge concluded that the putative father's motion to intervene in the adoption proceeding was barred by the one year statute of limitations governing attempts to invalidate a final decree of adoption. D.C.Code § 16-310 (1989). We hold that appellant had a constitutionally protected interest in fair notice of, and opportunity to participate in, the adoption proceedings because he timely grasped his "opportunity interest," Lehr v. Robertson, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983), in rearing the child he claims to have fathered. We further hold that he was denied that notice and opportunity, and thatassuming his paternity is established, a matter which remains in disputethese rights must be accorded him before this adoption may become final. We express no opinion on the ultimate issue of whether the adoption entered by the trial court is in the best interests of the child. D.C.Code § 16-309(b)(3).

I.
Appellant M.J.L. claims to be the biological father of a female child (M.N.M.) born in St. Louis, Missouri on July 30, 1987.[1] According to appellant, he and the child's natural mother, L.C.M., had a relationship while both were seniors in high school, resulting in the birth of the child. It appears undisputed that early in June 1987, the mother and her parents met with a social worker employed by St. Louis Catholic Charities, and the mother stated her desire to give up the child she was carrying for adoption. Appellant claims that he and his parents were contacted by St. Louis Catholic Charities and that he asserted he was the father, opposed the adoption, and expressed his desire to raise the child.[2] On July 29, 1987, one day before the birth, L.C.M.'s father contacted appellees, Associated Catholic Charities of the Archdiocese of Washington, D.C., Inc. (hereafter the adoption agency), a licensed adoption agency in the District of Columbia, and arranged to put the child up for adoption in the District of Columbia. On August 3, 1987, the child, the mother and her father arrived in the District. The baby was placed in a pre-adoption home on August 4, 1987. On the same day, L.C.M. signed an affidavit stating that although she knew who the natural father was, she did not know his whereabouts and would not identify him.
On August 6, 1987, appellant filed a paternity and custody action in St. Louis County in an attempt to halt any adoption. In the District, the adoption process continued, with the baby being placed in an adoptive home on August 20, 1987. On January 1, 1988, appellant re-filed his paternity and custody action[3] this time in St. Louis City, the mother's place of residence. In connection with his lawsuits, appellant deposed L.C.M.'s father on September 17, 1987 and L.C.M. on February 12, 1988, in an attempt to locate the child. Both refused to answer any questions about the child or its whereabouts.
On November 5, 1987, the adoptive parents (also appellees in this appeal) had filed a petition for adoption in the Superior *923 Court of the District of Columbia. In furtherance of this petition, the adoption agency filed its report on February 19, 1988, in which it stated that it had attempted to learn the name of the natural father from L.C.M., but that she refused to provide it. After inquiring into her reasons for the refusal, the agency apparently concluded that they were sufficient and recommended to the court that the adoption go forward. The record does not reveal any effort by the adoption agency, other than questioning L.C.M., to identify or locate appellant, to notify him of the pending adoption proceeding, or to gain his consent to the adoption, although both notice and consent of the natural father are required by statute, D.C.Code §§ 16-304, -306.[4] The trial court entered a final adoption decree on April 11, 1988. The record contains no order requiring that notice to appellant be attempted, nor a finding by the court that efforts to notify appellant would be futile. D.C.Code § 16-304(d).
In St. Louis, appellant proceeded with his suit before Judge Robert G. Dowd, Jr. On September 23, 1988, a hearing was held before a special master in the presence of appellant, the mother, and her father. The special master found that L.C.M. and her father still refused to provide information about the location of the baby, and concluded that the suit could not be settled and should proceed to trial. In late October 1988, the office of the St. Louis County Attorney informed appellant that it was aware of adoption proceedings concerning the child in the District of Columbia, but furnished him no specific information about the proceeding such as the court or docket number. On November 14, 1988, Judge Dowd entered an order instructing the County Attorney to give appellant any information he had about the child.
Shortly after January 6, 1989, the majority of the Superior Court judges, including the trial judge presiding over the adoption of M.N.M., received a letter signed by appellant stating he had learned from Judge Dowd that, according to the St. Louis County Attorney, the child M.N.M. "has been put up for adoption in the Washington, D.C. area through the Catholic Charities Organization." The letter pointed out that appellant's paternity case would be heard by Judge Dowd in early 1989, and continued:
Right now I am very concerned about the adoption being finalized and the associated waiting period expiring before my case can be heard. I need someone in the Washington D.C. Superior Court to be aware of the truth in this situation so that a fair decision can be made. Catholic Charities of Washington D.C.fearing liabilitywants a court order to open any records or even to acknowledge their role in the adoption process. I cannot file a petition to prevent/set aside the adoption because I don't know in which court the adoption is taking place.
* * * * * *
I realize that there are numerous regulations preventing the release of records in adoption cases, so I am not asking you to do that. However, I am asking that if this case is or was before you in Washington D.C. Superior Court to please contact one of the following [listed persons] so I may have my day in court.
On January 12, 1989, a Family Division judge in receipt of appellant's letter responded by stating that "appropriate notices will be given if the adoption matter to which [appellant] refers is currently pending in this court." A second trial court judge informed appellant that, unless he furnished a designated docket number, no search through Superior Court records could be accomplished. On January 18, *924 1989, Judge Mencher, then Presiding Judge of the Family Division of Superior Court, wrote Judge Dowd in St. Louis requesting informationincluding pleadings and transcriptsabout the case assertedly pending before him involving appellant. Judge Dowd apparently shared the letter with appellant or his St. Louis counsel, because on February 5, 1989, appellant wrote Judge Mencher and enclosed the pleadings and depositions from the St. Louis lawsuit. Judge Dowd also responded to Judge Mencher on February 16, 1989, stating that he expected appellant to file suit in the District of Columbia. The one year statute of limitations governing attacks on final adoption decrees expired April 11, 1989.
On April 17, 1989, appellant wrote to Judge Mencher asking whether he should file pleadings in the District of Columbia and requesting the court and docket number for the adoption proceeding. On April 18, Judge Mencher informed appellant of the trial judge before whom the adoption case was pending; a letter sent to appellant by the Chief Deputy Clerk of the Family Division on May 12, 1989, provided the docket number of the case. On June 5, 1989, appellant filed a pro se motion to intervene in the adoption proceeding, alleging fraud, lack of notice, and constitutional violations. This filing came one month and twenty four days after the statute of limitations had expired.
The trial judge ordered responses on June 13, 1989. On November 8 he asked the Office of Corporation Counsel to file an amicus brief, which was filed on January 24, 1990. On April 20, 1990, Judge Dowd wrote to the trial judge enclosing an order for blood tests to determine paternity which had been entered in the St. Louis suit on February 5, requesting that the order be given full faith and credit. A guardian ad litem was appointed for the child on June 27, 1990.

II.
In a memorandum opinion filed on October 1, 1990, the trial judge denied appellant's motion to intervene and declined to give full faith and credit to Judge Dowd's order for blood tests. The judge addressed only the fact that the statute of limitations for attacking a final adoption decree had expired.[5] He also denied appellant relief under Rule 60(b) of the Superior Court Rules of Civil Procedure, stating that because Rule 60 applied only to parties and appellant was being denied party status, Rule 60 was not available as a way around the statute of limitations.
The judge reasoned that although judges of the Superior Court were "aware" of appellant's claims as early as January 1989, appellant had failed to "regularly file" anything, as required by the statute, until after the one-year limitation period had run. The judge stated:
The sanctity of the adoption process can be preserved only by requiring strict adherence to procedural rules. See 16 D.C.Code Section 309-311; In re Wells, 281 F.2d 68 (D.C.1960). Until petitioner formally filed his Motion to Intervene, the Court could not know that he intended to actively pursue intervention in the adoption matter. The formal declaration of intention, however, came too late even though his counsel had much earlier indicated to Judge Dowd that he would be filing the necessary pleadings.
The judge found that appellant and his St. Louis attorney had been informed by Judge Dowd in early December that the child had recently been adopted in the District of Columbia; and that on January 23, 1989, appellant's attorney told Judge Dowd of his intent to file a motion to set aside the adoption in the District. Yet the motion had not been filed until more than four months later. Appellant's correspondence with the Superior Court judges in early January, the judge found, "was not `regularly filed' as required by the statute; it *925 was simply a request for information." The judge therefore denied the motion to intervene, denied full faith and credit to Judge Dowd's order directing appellant and the child to undergo blood testing, and rescinded his own previous order which had "indicat[ed] an inclination" to have such testing conducted.

III.

A.
This case presents a conflict between the powerful demand for finality in adoption proceedings reflected in D.C.Code § 16-310 and a serious apparent defect in the adoption order, namely, the failure to give notice of the pendency of the adoption proceedings to the putative natural father. We conclude that we must undertake the constitutional analysis required by Lehr v. Robertson, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983), to decide whether appellant may claim a protected due process interest in the outcome of the adoption proceeding and, if so, whether he was denied that process. See Appeal of H.R., 581 A.2d 1141 (D.C.1990). We address at the outset, however, appellant's claim that we need not pursue the constitutional inquiry because the trial judge erred in concluding that appellant had not "regularly filed" an opposition to the adoption decree within one year of its effective date, as required by D.C.Code § 16-310.
To avoid the constitutional problem, appellant urges us to construe § 16-310 flexibly to embrace letters such as those mailed to the judges in January 1989, expressing his objection to "the adoption being finalized." Indeed, he points out, one judge of the Superior Court replied essentially by telling him that the letter would serve as "notice" of his position to the adoption court if the case involving the child M.N.M. were in fact pending in Superior Court. We are unpersuaded by this argument. The trial judge correctly ruled that appellant's letter was not the motion or pleading "regularly filed" with the court which § 16-310 requires. The judge found the letter to be "simply a request for information." Even if it was something more than that, the judge was certainly correct in reasoning that it "was not the type of document which would call for a formal response by adopting parents/Associated Catholic Charities." Judges of the Superior Court receive numerous pro se letters in the course of a year stating real or imagined grievances and requesting information about cases; here the letter apparently was sent to all, or nearly all, of the trial judges. We are not disposed to construe such letters as motions "regularly filed" with the court so as to trigger reciprocal filing obligations by other affected parties. Particularly as concerns adoptions, as the trial judge recognized, a relaxed reading of the "regularly filed" requirement is incompatible with the clear legislative intent to impose finality on that process. Consequently, resort to statutory construction cannot spare us the need to address the constitutional questions in this case. Cf. Crowell v. Benson, 285 U.S. 22, 62, 52 S.Ct. 285, 296-97, 76 L.Ed. 598 (1932) (statutory construction to avoid constitutional question must be "fairly possible"). We turn then to the due process issues.

B.
Section 16-310 by its terms is intended to close the door on attempts to invalidate final adoption decrees after one year. Like the trial judge, we can discern no "equitable tolling" principle that suspends application of the limitations bar when an informal letter such as we have here is asked to do service for the formal filing commanded by the statute. Nevertheless, if the facts had been that appellant, through no neglect of his own, was denied notice of the adoption either before it took place or within the following year, Lehr v. Robertson leaves little doubt that the statute could not constitutionally be enforced against him. The trial judge appeared to recognize this but found that appellant, through his St. Louis counsel, had been aware since December 1988 or at least January 1989three months before the statute of limitations ranof the adoption in the District of Columbia. Under D.C.Code § 17-305(a) (1989), we must credit *926 that finding. We therefore face two questions. First, were appellant's actions such that he may legitimately claim due process protection and hence require the court to decide whether the notice he received was adequate under the Constitution? Second, if so, did the actual notice he received comport with due process (or "cure" any earlier denial of due process) so as to justify application of the bar of limitations to his claim?
Lehr teaches that the first inquiry is whether the natural father has grasped his "opportunity interest" in claiming the obligations and satisfactions of parenthood. Appeal of H.R., 581 A.2d at 1160 (opinion of Ferren, J.).
The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for the child's future, he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child's development. If he fails to do so, the Federal Constitution will not automatically compel a State to listen to his opinion of where the child's best interests lie.
Lehr, 463 U.S. at 262, 103 S.Ct. at 2993-94. In Lehr, the Court held that a natural father of a child born out of wedlock, who for two years before the adoption petition was filed "never had any significant custodial, personal, or financial relationship" with the child and failed to utilize a statutorily created putative father registry that would have given him automatic notice of all proceedings concerning the child, had not grasped his opportunity interest and thus had no claim to constitutional protection of his rights regarding the child. Id. at 262, 264-65, 103 S.Ct. at 2993-94, 2994-95.
Appellant argues, as he did in the trial court, that his efforts to assume responsibility for the child M.N.M. began before the child's birth when he learned of the prospective mother's intent to place the child for adoption, and declared his opposition to that plan and desire instead to raise the child himself. Appellees question the factual basis for these representations, see note 2, supra, but they are given credibility by the undisputed fact that appellant filed a paternity and custody action in St. Louis County a week after the child's birth. He seasonably deposed the mother's father (who was instrumental in relocating the child to the District of Columbia) in an unsuccessful effort to locate the child. After refiling his suit in the St. Louis City court in January 1988, he deposed the mother for the same purpose and to like effect. When the mother and her father continued to keep the child's whereabouts secret, a special master, in September 1988, recommended that the Missouri case proceed to trial. Meanwhile, in the District of Columbia, the adoption went forward to completion in April 1988 without any notice to appellant. Only in October did he begin to receive information which enabled the trial judge to find that, by the beginning of January 1989, appellant knew the child had been adopted in the District.
Appellant acted on this knowledge by sending the letter to the judges of the Superior Court summarized above,[6] stating that he could not "file a petition to prevent/set aside the adoption because I don't know in which court the adoption is taking place." A month later, after the Presiding Judge of the Family Division contacted Judge Dowd (who then apparently spoke with appellant or his attorney), appellant forwarded the pleadings and depositions from the St. Louis action to the Presiding Judge, who in turn, on April 18, advised appellant of the name of the trial judge handling the adoption case; and on May 12 the clerk informed appellant of the docket number. Appellant's motion to set aside the adoption was filed on June 5.
*927 Appellees argue that, notwithstanding these actions by appellant, he essentially abandoned his "opportunity interest" from December 1988 to June 1989 because he possessed enough information by December or January to have told Judge Dowd of his intent to file suit in the District of Columbia, presumably in the near future. Appellees argue that his subsequent behaviorwriting letters to the court and forwarding pleadings, instead of filing formal and timely objection to the adoptionis tantamount to the vincible ignorance which the Supreme Court in Lehr found insufficient to excuse the petitioner's noncompliance with New York's procedures governing adoption. See 463 U.S. at 264, 103 S.Ct. at 2995 ("The possibility that [petitioner] may have failed to [enroll himself in the putative father registry] because of his ignorance of the law cannot be a sufficient reason for criticizing the law itself").
We do not find the factual comparison with Lehr apt. In Lehr the father never sought "to establish a legal tie until after [the child] was two years old," id. at 262, 103 S.Ct. at 2994; appellant, by contrast, filed suit one week after the child's birth to establish paternity and claim the child as his. Moreover, the District of Columbia does not have a putative father registry of the kind that, in Lehr, placed "the right to receive notice [before the adoption took place] ... completely within [the petitioner's] control" by the simple act of mailing a postcard. Id. at 264, 103 S.Ct. at 2994-95. Appellant received notice, months after the fact, only by his own initiative in filing and pursuing the paternity suit in the St. Louis courts. And he did so despite the conceded efforts of the mother and her parents acquiesced in by the adoption agency to keep him in the dark. See Appeal of H.R., 581 A.2d at 1164-65 (opinion of Ferren, J.) (discussing significance of "state action" by licensed adoption agency in denying parent access to child and knowledge of proceedings). Finally, although we have no occasion here to assess blame to the mother and her parents for moving the child from St. Louis to the District of Columbia, we would ignore reality if we overlooked the difficulties this created for appellant (even aided by counsel) in seeking to learn and comply with the procedures of another state for moving to set aside an adoption decree. Appellant received varying responses to his letter requesting information from the Superior Court; more than one of these replies could have lulled him into believing he had lodged the necessary objection with the court. See page 923, supra.
All told, we are persuaded that appellant "early on, and continually," asserted his paternity and the right to assume the obligations of fathering M.N.M. Appeal of H.R., 581 A.2d at 1161 (opinion of Ferren, J.); see also id. at 1205 (opinion of Belson, J.). No claim is made that he was indifferent to the welfare of the child or the mother during the pre-natal stage, compare In re Adoption of Doe, 543 So.2d 741 (Fla. 1989) (cited in Appeal of H.R., 581 A.2d at 1162, opinion of Ferren, J.). And because the child, without his knowledge, was placed in the custody of the adoption agency almost from the moment of birth, he had no opportunity to "develop a relationship with his offspring," Lehr, 463 U.S. at 262, 103 S.Ct. at 2993, which he can be said to have abandoned by his subsequent conduct. The adoption went forward in the District of Columbia while appellant pursued the only means available to him to learn the child's whereabouts and prevent an adoptionfiling suit in St. Louis and deposing the mother and her father without success. Of greatest significance, he was denied entirely the statutory notice of the filing of the adoption petition required by District of Columbia law. Appeal of H.R., 581 A.2d at 1165 (opinion of Ferren, J.) (stressing "statutory right to immediate notice in evaluating whether [father] grasped his opportunity interest"); id. at 1189 n. 14 (opinion of Rogers, C.J.) ("statutory right to immediate notice of an adoption proceeding... is a critical factor in deciding whether [father] seized his opportunity interest"). We hold that appellant sufficiently asserted his parental interest and therefore may claim "substantial protection under the Due Process Clause." Lehr, 463 U.S. at 261, 103 S.Ct. at 2993.

*928 C.
We turn to the questions of what process appellant was entitled to, and whether it was denied him. In Armstrong v. Manzo, 380 U.S. 545, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965), an adoption case, the Supreme Court concluded: "It is clear that failure to give [the natural parent] notice of the pending adoption proceedings violated the most rudimentary demands of due process of law." Id. at 550, 85 S.Ct. at 1190 (emphasis added). In the District of Columbia, the notice required by due process is set forth statutorily. "Consent to a proposed adoption of a person under eighteen years of age is necessary ... from both parents, if they are both alive...." D.C.Code § 16-304(b)(2)(A). To implement this requirement, "due notice of pending adoption proceedings shall be given to each person whose consent is necessary thereto, immediately upon filing of a petition." D.C.Code § 16-306(a). But consent of a parent may be dispensed with if, "after such notice as the court directs," a parent cannot be located or has abandoned the child. D.C.Code § 16-304(d).
Appellees do not contend that the adoption agency attempted to notify appellant of the pending proceedings or that the trial court directed notice to him of the proceeding (or found that such notice would be futile).[7] Appellees also do not assert this to be a case in which fears about the safety of the child or other persons justified concealing the proposed adoption from the father. This court has not had occasion to decide whether extra-statutory concerns such as these might justify refusal to give a natural parent notice; we assume for present purposes that they may. But in view of the fundamental right at stake of a parent who has grasped his opportunity interest, Lehr, 463 U.S. at 261, 103 S.Ct. at 2993, such concerns would surely have to be exceptional before an adoption could be approved without the parent having been contacted or given the opportunity to be heard on the matter. The reasons the mother gave hereand the adoption agency acceptedfor concealing the proceedings from appellant fall well short of this exceptional showing; we do not understand appellees to argue otherwise.[8] Consequently, the failure to notify appellant in disregard of the statute would appear, without more, to violate his right to due process. Appeal of H.R., 581 A.2d at 1169 (opinion of Ferren, J.) (father's "statutoryand constitutionalright to notice... was violated when the court failed to provide him with immediate notice of the filing of the ... petition" as required by statute) (emphasis added; original emphasis deleted); id. at 1188 (opinion of Rogers, C.J.) (statutory requirement of immediate notice to natural parent "meets the requirement of due process as defined by Lehr").
Appellees contend, nonetheless, that whatever violation of due process resulted *929 from the failure to notify appellant of the pending adoption was overcome by the actual notice he received by early January 1989, which should have allowed him to challenge the adoption in proper form before the statute of limitations expired in April. Due process, they argue, is satisfied either by notice to the parent before the adoption decree is entered or by notice at least sufficient to permit the parent to intervene before the curtain of finality is lowered by the statute of limitations. A similar argument was made in Armstrong v. Manzo, supra. There the state appellate court had ruled "that whatever constitutional infirmity resulted from the failure to give the petitioner notice had been cured by the hearing subsequently afforded to him upon his motion to set aside the [adoption] decree." 380 U.S. at 550-51, 85 S.Ct. at 1191. The Supreme Court rejected this conclusion after comparing the burdens the parent faced in having to move to set aside the final decree with those the parties favoring adoption would have faced had he been given pre-adoption notice.[9] The Court held that only by setting aside the adoption decree and requiring de novo consideration of the petition could the father be "restored... to the position he would have occupied had due process of law been accorded to him in the first place." Id. at 552, 85 S.Ct. at 1191.
Title 16 of the D.C.Code, as the trial judge recognized, contains no procedural format for moving to set aside a final decree of adoption. Section 16-310 merely provides that "[a]n attempt to invalidate a final decree of adoption by reason of a ... procedural defect may not be received ... unless regularly filed with the court within one year ..." (emphasis added).[10] Thus, to set aside the adoption in this case, appellant had to move for relief from judgment within one year setting forth grounds under Rule 60(b) of the Superior Court Rules of Civil Procedure. See also Super.Ct.Dom.Rel.R. 60(b). As in Armstrong, it seems evident that the burden he faced would have been higher than the burden appellees would have faced at the original adoption proceeding had he been present contesting the adoption. See Appeal of H.R., 581 A.2d at 1189 (opinion of Rogers, C.J.) (as between natural parent who has seized his opportunity interest "and strangers to the child, the burden of proof is on the strangers to show by clear and convincing evidence that the best interest of the child requires custody be placed with the strangers"; this burden "will not be easily met where the parent is deemed to be fit").
But we need not hold that, in light of this altered burden, notice received by a natural parent for the first time after the adoption is final necessarily cannot cure a due process violation. At a minimum, the actual notice and opportunity to challenge the decree must be manifest before it can be held to overcome the complete denial of pre-adoption notice. A different rule would provide an incentive to parties to delay notice to a parent until such time (i.e., after the final decree) as the objecting party *930 must demonstrate diligence in attacking it. Appellant learned of the adoption in the District in early January, three months before the statute of limitations expired. His ensuing conduct must be evaluated in the setting described earlier, viz., in which he was required to comply with the procedures in a distant jurisdiction for filing proper objection, and in which replies by the Superior Court to his letter of January 6 could have suggested to him reasonably that his objection had been registered. (Hence, in response to the request by the Presiding Judge of the Family Division to Judge Dowd for transcripts and pleadings in appellant's Missouri case, appellant promptly forwarded these to the Superior Court well within the statute of limitations.) In sum, while appellant's pursuit of his claim in the District of Columbia after January 6 was perhaps maladroit, we cannot hold that it amounted to forfeiture of his opportunity to challenge the final adoption. Compliance with the requirement of pre-adoption notice is vital because, much like the statute of limitations itself, it insures that the best interest of the child will be determined once and for all.[11] To hold that the notice appellant received was timely enough to cure his exclusion from the pre-adoption process would make light of this statutory imperative.

D.
We therefore hold that appellant's right to procedural due process was violated and that he must be "restored ... to the position he would have occupied had due process of law been accorded to him in the first place." Armstrong, 380 U.S. at 552, 85 S.Ct. at 1191. But we repeat the cautionary point made at the beginning: the issue here is not whether the adoption ordered is in the best interest of this child. As we noted previously, supra note 1, appellant's paternity remains in dispute; before anything else takes place, the parties and the trial court must resolve that question. Furthermore, many factors must be evaluated in deciding what disposition is best for this child, including the fact that he has lived with the adoptive parents for more than four years. We hold only that, assuming paternity, appellant must be accorded the opportunity to voice "his opinion of where the child's best interests lie," Lehr, 463 U.S. at 262, 103 S.Ct. at 2994.
Judgment vacated and case remanded for further proceedings consistent with this opinion.
GALLAGHER, Senior Judge, dissenting.
In deciding this case, I believe we should do so on the entire record as we now find it and not on the basis of the record as it stood when the adoption proceeding was commenced. It would be more in accordance with the realities of this proceeding. As matters now stand, for example, the indication from a St. Louis deposition is that another young man (not appellant) had sexual relations with the teenage mother at a crucial time in relation to the birth, as later explained. This factor makes questionable appellant's reference to himself as the father of the child, as this is an open question. As a matter of fact, it was appellant who submitted to the court the deposition of the second youth. Yet, inexplicably, he nevertheless continues to take the flat position that he is the father.
I view this unique record rather differently than the majority. Unquestionably, the statutory notice of the adoption proceeding was not given to appellant and, standing alone, this may raise a procedural due process issue. But he and his St. Louis attorney had actual knowledge of the local adoption proceeding here for several months before the motion to intervene in the adoption proceeding in the local trial court was filed and yet took no legal action to further his interest until it was too late. His experienced counsel would have had no serious difficulty tracing the proceeding. It would be an elementary problem for *931 counsel, perhaps a matter of a few phone calls.
This case is further complicated by the reality that we have two potential fathers of the adopted child. The first is the young appellant. The other is a young man who, during a deposition in the St. Louis parentage proceeding instituted by appellant, has stated that he had sexual relations with the then seventeen-year-old mother on at least two occasions, once late in the last week in October 1986 (at a Halloween Party), preceding the July 30, 1987 birth of the child, and again in early November 1986. The child was born on July 30, 1987, and the record shows the pregnancy of the mother to have been full term. One or both of the asserted relations with the second young man (not appellant) were in the critical period for the pregnancy resulting in the birth on July 30, 1987. Notwithstanding this, appellant flatly asserts parenthood even though he has been aware of the second young man's deposition in the St. Louis proceeding since January 27, 1990. Parenthetically, the second young man indicated he has no interest in assuming parental responsibility for the child.
So, we have at this juncture a rather complex set of facts. On the one hand, we have two potential natural fathers, one of whom is pressing for parentage rights. On the other hand, so far as it appears, the child is situated in a happy adopted home environment where she has been since she was about two weeks old and she is now nearing five years of age. Reopening of the adoption proceeding would seriously affect the child and the adoptive parents.
Appellant started pressing for parentage rights when, while in his teens, he learned of the pregnancy. At the time, neither his parents nor the teenage mother's parents believed either the teenage boy (appellant) or girl were fit to parent the child. However, the young putative father later instituted a parentage proceeding in St. Louis, Missouri, where he and the child's mother resided, soon after he learned of the child's birth. He retained a law firm there to represent him in the proceeding. His attorney continued to represent him over a long period and, in fact, represented him at least as late as the deposition of the second potential father in the St. Louis proceeding, and there cross-examined that youth on January 27, 1990. He is also represented by counsel on this appeal.
Importantly, his attorney represented to the presiding judge in St. Louis on or before January 23, 1989, that he intended to file a motion by appellant to intervene in the adoption proceeding in this city, but several months went by and this was not done. Instead, appellant himself wrote many letters to many local judges. If the motion had been filed at any time within three months after his attorney stated the motion would be filed, it would have been inside the local statutory period in relation to the adoption proceeding. But the motion to intervene was not filed until about six months after his St. Louis attorney announced to the St. Louis court his intention to file. By then, it was too late. Instead, there was more than a six month period of unaccountable delay after he learned of the local adoption, even though the attorney continued to represent him in the parentage proceeding in St. Louis at that time.[1]
I am unable to view this record as portraying a young man floundering alone in a legal maze and not being able to ascertain in which court in Washington, D.C. the adoption proceeding was pending or what to do about it. He was represented in St. Louis at all pertinent times by experienced counsel. This is apparent from the record before us. It is something of a mystery on this record as to why, having learned of the local adoption proceeding, he did not, as his counsel announced to the St. Louis court, pursue his parentage claim in our trial court proceeding during all those months, but instead waited until it was much too *932 late and then filed the motion.[2] The statute of limitations had then run. His actions, or failure to act, belied his expressed desire to parent the child. Yet, at all times he was represented by counsel.
So, we have the involved human equation of a young man recurringly anxious to establish he is the natural father of the now nearly five-year-old adopted girl. He is a putative father who was not given statutory notice of the local adoption proceeding to which he was entitled. Yet, he had actual knowledge of the adoption proceeding, as did his St. Louis lawyer who was representing him in the proceeding in progress there to establish his parentage. "It is well settled that notification purposed to inform may be replaced by actual knowledge." Clark v. Wolman, 243 Md. 597, 221 A.2d 687, 688 (1966) (citing 1 MERRILL, NOTICE, 480).
Meanwhile, another young man in St. Louis has admitted he had sexual relations with the young natural mother at a time which, upon computation, we know would be crucial to the birth.[3] The problem is further deepened by the reality that the little girl being struggled over is now almost five and has lived with her adopted parents in a seemingly happy home since she was a week or two old. Her adoptive parents have been parents to her all those years and probably could not bear the thought of losing her.
These are the realities, and they should all be considered in deciding what to do about this proceeding at this time. The majority says appellant was denied procedural due process and he must be "restored to the position he would have occupied had due process of law been accorded to him in the first place." This is explained as a holding here that "`appellant must be accorded the opportunity to voice' his opinion of where the child's best interests lie." This is qualified by a requirement that appellant must first establish his parentage by a blood test.
I, on the other hand, view the problem as being more complicated than purely the issue arising from statutory notice deprivation. The failure of statutory notice must surely be factored into resolution of the ultimate issue. But I would deal also with the realities. First, appellant and his lawyer hung back all that time after learning of the local adoption proceeding and represented to the St. Louis court that a motion would be filed in the local adoption proceeding here, before actually moving to intervene. They waited until it was three months past the expiration of the statute of limitations to file the motion.[4] Second, there is a strong public interest in protecting the finality of adoption decrees. This is because prospective adoptive parents could not reasonably be expected to pursue this interest if after the whole long process is ended, they may nevertheless sometime in the future lose their adopted child to one claiming a higher priority, e.g., a putative natural parent. This case presents a classical example of how this may occur. If adoptive parents are at risk of losing an adopted child under the circumstances here presented, this might chill locally the movement toward child adoption. So, there is a strong public interest in protecting the finality of adoption decrees once the statute of limitations period has expired. In re Wells, 108 U.S.App.D.C. 235, 281 F.2d 68 (1960). This was the essence of the trial court's holding in this proceeding.

I.
The majority appears to be holding that the letter writing engaged in by appellant in this proceeding, while represented by counsel in St. Louis concerning the same *933 parentage issue, satisfies the provisions of the local statute of limitations. This statute provides:
An attempt to invalidate a final decree of adoption by reason of a jurisdictional or procedural defect may not be received by any court of the District, unless regularly filed with the court within one year following the date the final decree became effective.
D.C.Code § 16-310 (1989 Repl.) (emphasis added).
As is seen, that statute is rigid in its requirement that an attempt to invalidate a final decree of adoption must be "regularly filed." It does not require only that it be filed, but has the unusual terminology that it be "regularly filed" within the one year period commencing with the entry of a final decree of adoption. This unusual grace period doubtless stems from histories of such disputes where custody disputes frequently arise between the unmarried parents.
Normally statutes of limitation commence to run in the period before the commencement of the litigation. It is important to consider that here the one year statute commences after the final decree of adoption, not before. It will be noted that the statute even goes so far as to specify that even "a jurisdictional" or procedural attack may not be received after the one year expiration; and within the one year period, the attack must be "regularly filed."
It is evident that these strict requirements are there because after a final decree of adoption, one would be seeking to remove a child from an established family. Here, for example, the child has been in the family since she was two or three weeks old and is now nearing five. It is entirely reasonable that this statute of limitations, which comes into play only after a final decree, would be tightly written. And I suggest the plain language should be construed the same way.
So, this court is faced squarely with an issue requiring construction of the local statute. The "regularly filed" requirement has been construed to mean documents considered a part of the record proper. In Territory v. Pinney, 15 N.M. 625, 114 P. 367 (Sup.Ct.New Mex.1910), the court stated "regularly" means in a regular manner, in "a way or method accordant to rule or established mode." See also Words & Phrases, Vol. 36A at 276 (1962 ed.).
It would appear that in this proceeding various trial judges, some being members of the Family Division of the trial court, did not consider that the letters from appellant constituted a "regular" filing in the Family Division during the period in which they were received. Otherwise, the filing would have been directed in the normal fashion, and this would have avoided the statute of limitations stricture. As a matter of public policy, in the interest of the stability of human affairs in relation to a permanent parent-child relationship, the legislature specifically provided for a hard and fast cut-off date of one year after the final decree of adoption. A statute of limitations is "a public policy about the privilege to litigate." Chase Securities Corp. v. Donaldson, 325 U.S. 304, 314, 65 S.Ct. 1137, 1142, 89 L.Ed. 1628 (1945). Not only do we have the unequivocal public policy delineated in the one year statute, but we know also that appellant had ample opportunity to move within the statutory period and did not do so.
If, as it appears, this court is necessarily establishing an important precedent in the matter of a construction of the rigid one year statute of limitations in adoption proceedings, I suggest the court should make this evident in its opinion in this case by squaring it with the stringent terms of the statute. I believe this court's holding may have a far-reaching impact in Family Division considerations of future adoption proceedings. And it may well be that the court may wish to delineate its reasoning on this aspect of the case because of the potential ramifications of a less than literal interpretation of the precise and studied language used in the statute. I do not believe we should tiptoe around it.
For my part, however, I would leave this adoption in repose.

*934 II.
Since the proceeding is going to be reopened, however, it might not be amiss to offer some comments regarding the remand procedure. I say this particularly because we have at our elbow the experience of the remand proceeding in the trial court resulting from this court's remand in Appeal of H.R. (In re Baby Boy C.), 581 A.2d 1141 (D.C.1990). After the evidentiary hearing on remand in that proceeding (Case No. A-249-83, Superior Court), the trial judge wrote a learned opinion which should not go unnoticed in this proceeding, in particular, as the fundamental issue is much the same in the two cases. (See In re Petition to Adopt Baby Boy C., No. A-249-83, Memorandum Opinion and Judgment (D.C.Super.Ct. January 3, 1992) (Zeldon, J.))
The experience of Baby Boy C was that upon learning of the remand proceeding in the trial court, the child "became anxious and bewildered ... [f]or a time he developed a nervous tic in his eye ... [h]e felt that he was in the ... home on a provisional basis." (Id., Memorandum Opinion at 8) The trial judge then goes on to state that the child wondered, "I'll always stay in this family won't I, even if I meet my father, my natural father?" (Id. at 9.) The trial judge stated also that the child "has picked up the anxiety of [the adoptive parents] notwithstanding their best efforts to shield him from their feelings of being threatened by [the natural father's] action.... Unavoidably, this case is causing [the child] stress and emotional pain." Id. at 8-9.
Using this background experience here, it would seem that, if avoidable, the adoptive family relationship should not be intruded upon until there is no other recourse in complying with the remand instructions. This is what I mean by that.
If on remand it is first established by blood tests that appellant is the natural father, the problem would then arise as to how to proceed from there. More particularly, there would be the question of how deeply to intrude into the adopted family.
Assuming the blood test established appellant's paternity, it strikes me that, in this particular case, the trial court might consider thoroughly exploring first appellant's fitness as a parent for the child, e.g., an examination of his stability, maturity, his ability to provide a home and to raise the child, and the real reason for his long delay on the intervention, even though he was represented by counsel. This exploration of appellant's fitness could be conducted without seriously upsetting the child's present adopted home life. That is, the naturally stress-inducing investigation directed toward the child and the adopted home, e.g., child psychoanalysis, home investigation, and the like, could be post-poned until appellant's fitness as a parent has been established. In other words, it might be that the remand problem could be resolved without causing the "stress and emotional pain" in the adopted home that was encountered in the Baby Boy C remand proceeding, supra. If not, and appellant first demonstrates he would be a stable, mature, responsible parent who would provide a sound, secure family environment for the child, then the usual, intrusive adopted family exploration would be unavoidable, after which the balancing process would follow, i.e., weighing the parentage interest of the biological father with the best interest of the child.[5]
NOTES
[1] So far as the record reveals, M.J.L.'s paternity has not yet been established. The mother disputes it, and obviously any voice to which appellant may be entitled in the adoption proceeding is contingent upon his first establishing paternity.
[2] In setting forth his version of the discussions between St. Louis Catholic Charities and the natural mother, as well as between the agency and himself, appellant relies on an unsigned, un-notarized deposition of a social worker at St. Louis Catholic Charities included in the record on appeal. Appellees ask us to ignore the deposition, which we largely do; but appellees have never proffered facts contradicting appellant's assertion that he claimed paternity and opposed the adoption once informed of the impending birth by St. Louis Catholic Charities.
[3] The original suit was dismissed for lack of jurisdiction and failure to prosecute.
[4] Appellees contend that any such efforts would have been futile. For example, appellees claim that Associated Catholic Charities was unaware of the participation of St. Louis Catholic Charities in the adoption process. The adoption report, however, reflects that the D.C. adoption agency knew at which hospital the child had been born. Appellant maintains that he had contacted the hospital repeatedly, including by hand-delivered letter, to request that it call him as soon as the child was born, giving both his telephone number and the number of the social worker at St. Louis Catholic Charities. In view of our disposition, it is unnecessary for the court to resolve this factual dispute.
[5] The statute of limitations states:

An attempt to invalidate a final decree of adoption by reason of a jurisdictional or procedural defect may not be received by any court of the District, unless regularly filed with the court within one year following the date the final decree became effective.
D.C.Code § 16-310 (emphasis added).
[6] Earlier, in October 1988, the record shows that he wrote similar letters of inquiry to federal district courts in Virginia and Maryland. The letter itself suggests that he had also contacted Associated Catholic Charities in Washington but had been refused any information without a court order requiring it.
[7] Appellees cite In re Wells, 108 U.S.App.D.C. 235, 281 F.2d 68 (1960), as supporting the proposition that this court has enforced the statute of limitations even where no notice of the adoption was given to the natural parent and the natural parent's consent had not been given. The court there did enforce the statute of limitations to block the unsealing of adoption records three years after the adoption was instituted. Id. at 237, 281 F.2d at 70. But in Wells the natural mother's consent, and notice to her, were never required. The natural mother's parental rights had been terminated in a proceeding forty five days after the child was born, and the child had been placed in the permanent custody of the Department of Public Welfare. Id. at 236, 281 F.2d at 69. Notice to and the consent of a natural parent whose parental rights have been terminated is not required; consent of "a licensed child-placing agency or the Commissioners in case the parental rights of the parent or parents have been terminated by any court of competent jurisdiction" is all that is necessary under D.C.Code § 16-213 (1960); see also D.C.Code § 16-304(b)(2)(D). Thus, in Wells the statutory prerequisites to a valid adoption had been met.
[8] The adoption report filed with the court adverts to the mother's fear of possible violence by the father toward himself of others if he learned of the proposed adoption. But those concerns are broadly stated and have never been substantiated on the record; and appellees do not rely on them on appeal. The report also states that the mother and her parents wished to retain the confidentiality of the pregnancy and that they were experiencing family problems that would be compounded by involving the alleged father. These reasons are insufficient on their face as grounds for excluding the father from the adoption process.
[9] Had the petitioner been given the timely notice which the Constitution requires, the Manzos, as the moving parties, would have had the burden of proving their case as against whatever defenses the petitioner might have interposed. It would have been incumbent upon them to show not only that Salvatore Manzo met all the requisites of an adoptive parent under Texas law, but also to prove why the petitioner's consent to the adoption was not required. Had neither side offered any evidence, those who initiated the adoption proceedings could not have prevailed.

Instead, the petitioner was faced on his first appearance in the courtroom with the task of overcoming an adverse decree entered by one judge, based upon a finding of non-support made by another judge. As the record shows, there was placed upon the petitioner the burden of affirmatively showing that he had contributed to the support of his daughter to the limit of his financial ability over the period involved. The burdens thus placed upon the petitioner were real, not purely theoretical. For "it is plain that where the burden of proof lies may be decisive of the outcome." Yet these burdens would not have been imposed upon him had he been given timely notice in accord with the Constitution.
Armstrong v. Manzo, 380 U.S. at 551, 85 S.Ct. at 1191 (internal citations omitted).
[10] By contrast, under D.C.Code § 16-309(e) the trial court "may revoke its interlocutory decree for good cause shown at any time before it becomes a final decree ..." (emphasis added).
[11] Where competing parties in the proceeding are given opportunity for a thorough hearing, and the petition is vigorously advocated and contested, and witnesses are cross-examined, the interests of the adoptee can be fully presented to the court.

In re Adoption of a Female Infant, 237 A.2d 468, 470 (D.C.1968).
[1] Appellant learned of the adoption in this city on December 1, 1988. He filed the motion to intervene on June 5, 1989.
[2] The trial judge in this proceeding observed that the motion to intervene that was finally filed pro se actually appeared to have been prepared with the aid of legal advice. I too have the impression that there was professional participation in filings by appellant contained in the record of this proceeding at the trial court level. On this appeal, he is represented by counsel.
[3] He testified he had relations at a Halloween Party (October 31st) and the full term birth occurred the following July 30th. He testified also that he had relations in early November, after the Halloween Party.
[4] See note 1, supra.
[5] In this respect, I found the analytical approach of the trial judge in the Baby Boy C remand proceeding, supra, to be quite impressive.