665 A.2d 207 (1995)
In re T.M., Appellant.
No. 92-FS-1576.
District of Columbia Court of Appeals.
Argued June 6, 1994.
Decided September 28, 1995.
*208 Teresa R. Donohoe, Baltimore, MD, for appellant.
Mary Wilson, Assistant Corporation Counsel, Washington DC, with whom John Payton, Corporation Counsel at the time the brief was filed, and Charles L. Reischel, Deputy Corporation Counsel, were on the brief, for appellee.
Before WAGNER, Chief Judge,[*] and FERREN and STEADMAN, Associate Judges.
WAGNER, Chief Judge:
This appeal arises out of a proceeding initiated on behalf of T.M., a minor child, by her guardian ad litem seeking termination of the parental rights of the child's mother, K.M., and two named putative fathers, J.C. and D.J. The trial court terminated the parental rights of the mother, but denied the petition with respect to the putative fathers "for lack of proof." Although the trial court's order does not elaborate further upon the basis for its ruling with respect to the named putative fathers, the transcript of the proceedings reveals that the trial court declined to consider termination with respect to J.C.'s and D.J.'s rights, if any, because it concluded that paternity, which had not been established, must be determined before parental rights can be terminated. Therefore, the court concluded that any putative father's rights should be addressed in any subsequent adoption proceeding. T.M. and the Corporation Counsel for the District of Columbia (the District) argue on appeal that the trial court erred in declining to terminate the "parental" rights of the putative fathers, both of whom had been duly served with process in the action. We agree, and reverse and remand for further proceedings consistent with this opinion.

I.
T.M. was born on December 6, 1989. When she was less than two months old, she was found abandoned on the sidewalk. On April 9, 1990, the child was adjudicated to be a neglected child pursuant to D.C.Code § 16-2301(9)(B) (1989).[1] The adjudication was based on a stipulation signed by her mother, K.M., in which she admitted that she had left the child with D.J. who in turn left the child on the sidewalk where the police found her. The paternity of the child had never been established. Initially, K.M. told authorities that J.C. was the father. However, a social worker in the case filed a report stating that on October 9, 1990, D.J. contacted her and said that he could be T.M.'s father, and if that were true, he would like to raise her. He admitted during the conversation that he left T.M. abandoned on the sidewalk due to his abuse of drugs and alcohol, but he said that he had since "been clean for several months, attends church and `has strong people' behind him." He stated that he wanted to attend a court review in the neglect case *209 on November 15, 1990 and that he would submit to a blood test in order to determine whether he was the child's father. On November 1, 1990, the court ordered D.J., K.M., and T.M. to submit to a human leukocyte antigen (HLA) test to determine the child's parentage. See D.C.Code § 16-2343 (1989). However, D.J. did not appear for the HLA testing.
On June 19, 1991, T.M.'s guardian ad litem (GAL) filed a motion to terminate the parental rights of K.M. and the two putative fathers, J.C. and D.J. (TPR motion). In support of the motion, the GAL contended, inter alia, that T.M.'s "parents' demonstrated lack of interest in the [child] for a prolonged period of time indicates the parents' inability or unwillingness to care for or provide a stable home for the [child]." The GAL also stated that the man the mother identified as the father, J.C., denied paternity and that the other putative father, D.J., had not visited the child since July, 1990, and had failed to submit to HLA testing to determine paternity.
The court held a hearing on the TPR motion. T.M.'s counsel represented that J.C. was personally served with notice of the TPR proceeding, and that D.J. was given constructive notice by posting pursuant to court order.[2] Neither man appeared at the TPR hearing. At the commencement of the hearing, the court stated that it would not terminate the rights of a putative father without first establishing the actual paternity of the child and that the burden was on the child to establish the relationship of parent and child before it is terminated. The GAL urged the court as an alternative to terminate the rights of the putative fathers "conditionally." Reasoning that such rights could not be terminated "tentatively," the court adhered to the position that it could not terminate parental rights unless paternity was established first. The court also explained that termination as to any father or putative father could be accomplished in any subsequent adoption proceeding. Therefore, the court proceeded with the TPR hearing only as to the child's mother, K.M. The court terminated K.M.'s parental rights, finding that it was in the child's best interest.[3] K.M. has not appealed from the court's ruling. T.M. appeals from the court's decision refusing to terminate the rights of her putative fathers, J.C. and D.J., and the District joins in that claim.

II.
T.M. and the District make essentially the same argument on appeal. They argue that the trial court erred in refusing to allow the motion for TPR to proceed against two putative fathers who had been properly served in the case. They contend that the trial court's decision rested upon two erroneous premises: (1) that a determination of paternity is required before the court can entertain a petition to terminate the parental rights of a party claiming to be the child's father; and, (2) that the rights of a putative father cannot be addressed in a TPR proceeding. We conclude that, consistent with the applicable statute, and to effectuate its purpose, the trial court has the authority to address the rights of a putative father in a TPR proceeding.
T.M.'s GAL filed on her behalf a motion to terminate parental rights under the provisions of D.C.Code §§ 16-2351 through -2365 (1989) (TPR statute). The TPR statute authorizes the District of Columbia government or the child, through a legal representative, to petition the court to terminate parental rights in a proceeding where the child has been adjudicated neglected, as T.M. was. See D.C.Code § 16-2354. The purposes *210 of the statute are: "(1) to encourage stability in the life of the neglected child; (2) to ensure the recognition and enforcement of the constitutional rights of all parties; and (3) to increase the opportunities for prompt adoptive placement." In re A.B.E., 564 A.2d 751, 756 (D.C.1989); see also In re Baby Girl D.S., 600 A.2d 71, 87 (D.C.1991). The TPR statute authorizes the court to enter an order permanently terminating the parent-child relationship if it finds by clear and convincing evidence that it is in the "best interests of the child." D.C.Code § 16-2353(a).
While the statute does not define the word "parent," it defines the parent and child relationship as follows:
"[p]arent and child relationship" includes all rights, powers, privileges, immunities, duties and obligations existing under law between a parent and child, including rights of inheritance. The words apply equally to every child and every parent regardless of the marital status of the parents of the child.
D.C.Code § 16-2352(a)(1). A question which arises as a result of the parties' arguments is whether the rights of a putative parent are among those covered by the statute. The nature of a putative father's rights and the statutory purpose suggest that they are included. It is now recognized that a putative father has a right to "grasp" his "opportunity interest" in claiming the obligations of being a parent. See Lehr v. Robertson, 463 U.S. 248, 262, 103 S.Ct. 2985, 2993, 77 L.Ed.2d 614 (1983); see also M.N.M., 605 A.2d 921, 926 (D.C.), cert. denied, ___ U.S. ___, 113 S.Ct. 636, 121 L.Ed.2d 567 (1992). As the Supreme Court explained in Lehr
The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for the child's future, he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child's development. If he fails to do so, the Federal Constitution will not automatically compel a State to listen to his opinion of where the child's best interests lie.
463 U.S. at 262, 103 S.Ct. at 2993-94.
To assure that a putative father has an opportunity to assert such right, under certain circumstances, he is entitled to due notice of the proceedings. See, e.g., In re M.N.M., supra, 605 A.2d at 923. The right of a putative father to notice of a pending adoption proceeding does not depend upon proof that the putative father is in fact the biological father. Id. at 926 (putative father entitled to notice of adoption, although paternity not yet established); see also Appeal of H.R., 581 A.2d 1141, 1165 (D.C.1990) (opinion of Ferren, J.), cert. denied, ___ U.S. ___, 115 S.Ct. 58, 130 L.Ed.2d 16 (1994). Unless a putative father is apprised that proceedings are pending affecting the best interest of a child of whom he claims to be the natural parent, he may never have a meaningful opportunity to be heard on his claim or to assert his right to be heard on the question of the child's best interest. See id. at 1161 (citing Lehr, supra, 463 U.S. at 248, 103 S.Ct. at 2986).[4]
*211 In an adoption proceeding, the putative father may be required to establish paternity before he can contest the adoption or require the court to consider his opinion as to the child's best interest. See Lehr, supra, 463 U.S. at 262, 103 S.Ct. at 2993; see also M.N.M., supra, 605 A.2d at 922 n. 1. Similarly, as the trial court correctly observed in this case, it is essential to establish the relationship of father and son or daughter before terminating that relationship. In the TPR proceeding, there is no legal prohibition to the trial court resolving the issue of paternity of a putative father who has been identified by the child's mother as the father or who claims that status, provided he has been afforded proper notice and an opportunity to be heard. However, there are other issues relevant to a TPR proceeding, which has as its purpose increasing the opportunities for adoptive placement for children while ensuring the constitutional rights of all parties are recognized and enforced. See D.C.Code § 16-2351. One such issue is the right of a putative father to assert in a subsequent proceeding his biological relationship to the child and that he has grasped his opportunity interest to develop a relationship with his child. H.R., supra, 581 A.2d at 1161. So long as the putative father's claims with respect to the child in this regard remain unresolved, the goals of the TPR statute of promoting stability in the child's life and increasing the chances of adoptive placement will remain illusory. See A.B.E., supra, 564 A.2d at 756; see also D.C.Code § 16-2351. Therefore, we hold that, consistent with the statutory purpose, in a TPR proceeding, the trial court has the authority to resolve finally any claimed putative father's right to assert paternity in a subsequent proceeding provided he has been served properly with notice and has been afforded an opportunity to be heard on the issue. See Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950).
There is another reason why we conclude that the statute must be construed to authorize the court to adjudicate the claims of putative parents. Although the statute does not explicitly include putative fathers as parties to the proceeding, it does not exclude them.[5] The statute provides expressly for the child, the parent of the child, and the agency having the child's legal custody to be parties. However, it also authorizes the court, at its discretion, to join additional parties on its own motion or in response to a motion for joinder or intervention. D.C.Code § 16-2356 (1989). Thus, the statute contemplates that the joinder of some other parties may be necessary to afford complete relief. Since the purpose of the TPR statute is to promote stability in the lives of neglected children by increasing their chances for adoptive placement, see A.B.E., supra, 564 A.2d at 756, the unresolved status of an individual who claims to be, or who has been identified as, the child's father undermines that purpose. Moreover, the statute provides that it shall be liberally construed to promote its general purposes. D.C.Code § 16-2351(b). Therefore, it is entirely consistent with this statutory scheme to adjudicate issues of paternity in the TPR proceeding, as well as to dispose of the claims of any putative fathers who have been properly served in the action. To the extent that the putative fathers seek to challenge the extinguishment of any rights they might have with respect to the child, they have an opportunity *212 to do so in the TPR proceeding when properly before the court. There is no language in the statute which precludes such action.
This court has acknowledged the intent of the Council of the District of Columbia to provide for the early termination of parental rights to free a child for adoption, "even though no adoption petition [is] pending." Baby Girl D.S., supra, 600 A.2d at 87 ("the sooner a child is freed for purposes of an adoptive placement, the sooner he or she will finally obtain an environment of permanence and continuity of relationships") (quoting COUNCIL OF THE DISTRICT OF COLUMBIA, COMMITTEE ON THE JUDICIARY, REPORT ON TITLE IV OF BILL No. 2-48, "THE PREVENTION OF CHILD ABUSE AND NEGLECT ACT OF 1977" (MARCH 29, 1977) (COUNCIL REPORT)). Since the statutory purpose of enhancing a child's opportunity for adoption would be served by allowing the termination of a putative father's parental rights, the trial court is authorized to consider putative fathers as "parents" and to terminate their rights and interests in the child without recourse to separate adoption proceedings. See Peoples Drug Stores v. District of Columbia, 470 A.2d 751, 754 (D.C.1983) (court may refuse adherence to strict language of statute to effectuate legislative purpose as gleaned from statute as a whole and legislative history).
The trial court expressed the view that termination of the putative fathers' rights would be ineffective as to one and a nullity as to the other, and therefore, would not enhance the child's opportunity for adoption. The trial court apparently equated "father" with biological father and concluded that a final disposition could only be made as to the biological father. Since neither putative father had established paternity in accordance with D.C.Code § 16-909 (1989 Repl.), the trial court assumed that at least one putative father had no rights to terminate. Although only one person can be a child's biological parent, others may assert paternity and thereby gain status as a "putative parent" by "acknowledg[ing] paternity in writing." D.C.Code § 16-909(a)(4) (1995 Supp.). By failing to terminate the putative fathers' parental rights, the trial court allowed both men to retain the right to be notified of a pending adoption and any other rights attendant to putative father status, including, presumably, the right to grasp their opportunity interest.
The trial court made its ruling on the erroneous premise that a putative father's rights cannot be resolved without establishing paternity. This court's task in determining whether the trial court abused its discretion
is to ensure "that the trial court has exercised its discretion within the range of permissible alternatives, based on all relevant factors and no improper factor ..." and then "[to] evaluate whether the decision is supported by `substantial' reasoning... `drawn from a firm factual foundation' in the record."
In re D.R.M., 570 A.2d 796, 803 (D.C.1990). Here, the trial court did not recognize its discretion to terminate any rights of the putative fathers. The court's failure to recognize that it had this alternative requires this court to find an abuse of discretion. See Johnson v. United States, 398 A.2d 354, 363 (D.C.1979).
In this case, it was reported to the court that both putative fathers were given notice of the hearing sufficient under the Constitution. Neither one appeared. We leave to the trial court on remand to determine the adequacy of the notice, since that issue was not the focus of its decision to decline to consider disposition of any rights of the putative fathers. The GAL and the District contend that neither man had ever attempted to assume a role in the child's life, although she was two and one-half years old at the time of the hearing.[6] Since this issue was not fully developed in the trial court, we leave it to the trial court's consideration on remand.
*213 For the foregoing reasons, we reverse and remand to the trial court for further proceedings consistent with this opinion.
NOTES
[*] Judge Wagner was an Associate Judge of the court at the time of argument. Her status changed to Chief Judge on June 14, 1994.
[1] D.C.Code § 16-2301(9)(B) defines a neglected child as

[one] who is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his or her physical, mental, or emotional health, and the deprivation is not due to the lack of financial means of his or her parent, guardian, or other custodian[.]
[2] The court granted T.M.'s motion to effectuate alternative service by posting after an investigator for the GAL submitted an affidavit setting forth his unsuccessful attempts to locate D.J. These attempts included going to D.J.'s last known address and searching the records of area hospitals, D.C. shelters, the D.C. Jail and Lorton, the D.C. Morgue, the Income Maintenance Administration, the Voter Registration office and area telephone directories. See In re E.S.N., 446 A.2d 16, 18 (D.C.1982).
[3] The trial court considered the statutory factors for determining whether termination of the parent-child relationship was in T.M.'s best interest and made written findings of fact and conclusions of law that it was. See D.C.Code § 16-2353(b) (1989).
[4] In H.R., this court observed in its per curiam opinion

Because a noncustodial father may not grasp the opportunity to develop a relationship with his child in a timely, meaningful manner, his eventual assertion of his opportunity interest may be too late and thus not entitled to the constitutional protection available to a custodial father.
581 A.2d at 1161. In Lehr, the Supreme Court rejected a putative father's due process and equal protection challenges to an adoption decree although he had not been given notice of the proceeding. By the time the adoption proceeding was filed, Lehr had not established a "custodial, personal, or financial relationship with [the child]," although this was due to a great extent to the mother's action in thwarting it. 463 U.S. at 252-53, 267-68, 269, 103 S.Ct. at 2988-89, 2996-97, 2997. The Court recognized that an unwed father who had demonstrated full commitment to the responsibilities of parenthood is entitled to substantial protection under the Due Process Clause. Id. at 261, 103 S.Ct. at 2993. Lehr filed a paternity action seeking a determination of paternity, an order of support and for reasonable visitation with the child. This action came too late, as the child was by then two years old, and the adoption proceeding had been commenced one month earlier in another state. The Supreme Court determined that the New York statutes, which provided notice to seven categories of putative fathers, including those who registered as such (which Lehr did not do) adequately protected Lehr's interest in establishing a relationship with his child. Id. at 263, 265, 103 S.Ct. at 2994, 2995. It also held that where one parent had established a custodial relationship with the child and the other parent had never done so, the Equal Protection Clause does not prevent states from according the parents different legal rights. Id. at 268, 103 S.Ct. at 2997.
[5] Some states include the term "alleged" or "putative" father in the definition of "parent" in statutes providing for termination of parental rights or adoption statutes. See Ala.Code § 26-18-3(6) (parents are defined as "[t]he legal or biological parents of a child, inclusive of a putative father"); Wash.Rev.Code § 26.33.100(1) (provides for termination of rights of alleged father). The State of New York maintains a registry for putative fathers. A man who registers claiming to be the father of a child born out of wedlock is entitled to notice of any proceeding to adopt the child. N.Y.Soc.Serv.Law, § 372-c (McKinney Supp.1982-83); see Lehr, supra, 463 U.S. at 250-51, 103 S.Ct. at 2987-88. The New York law also requires notice of adoption proceedings to be given to certain other described possible fathers. Id. at 251, 103 S.Ct. at 2988.
[6] The social worker reported that D.J. initially made overtures in an effort to assert his opportunity interest by expressing his desire to raise T.M. if he was indeed her father. However, D.J. failed to submit to a blood test and to appear at the hearing. It is for the trial court to determine whether whatever opportunity interest he might have had, remains subject to constitutional protection under the circumstances.