724 A.2d 590 (1999)
In re C.T.
In re S.T.
C.M.J., Appellant.
Nos. 96-FS-872, 96-FS-873.
District of Columbia Court of Appeals.
Argued September 17, 1997.
Decided February 11, 1999.
*591 Beverly G. Stone, Greenbelt, MD, for appellant.
Marion E. Baurley, Washington, DC, for appellees C.T. and S.T.
Marc L. Resnick, Silver Spring, MD, filed a brief for appellee S.J.T.
Jo Anne Robinson, Acting Corporation Counsel, Charles L. Reischel, Deputy Corporation Counsel, and Sheila Kaplan, Assistant Corporation Counsel, filed a statement in lieu of brief for appellee District of Columbia.
Before WAGNER, Chief Judge, and TERRY and REID, Associate Judges.
TERRY, Associate Judge:
This termination of parental rights (TPR) case involves two young boys, each less than six years old, who have lived all but a few months of their short lives under the protection of the child welfare authorities. They were born to the same mother but have different fathers. Appellant C.M.J., the father of C.T., appeals from an order granting petitions filed by the children's guardian ad litem for the termination of parental rights.[1] Appellant contends that, in ruling on the petitions, the trial court did not apply the correct standard of proof and that, without clear and convincing evidence of the availability of an adoptive home, the TPR petitions should not have been granted. We reject both of these arguments. However, because the court failed to give sufficient consideration to the possibly limited duration of appellant's unfitness and to other potential adoptive resources, we vacate the TPR order in part, insofar as it terminates appellant's parental rights with respect to C.T. (appeal No. 96-FS-872), and remand the case for further proceedings. With respect to S.T. (appeal No. 96-FS-873), because appellant is not the child's father, he has no parental rights to terminate. He therefore does not have standing to challenge the TPR order. Accordingly, we dismiss the appeal in S.T.'s case, leaving the TPR order undisturbed as to him.

I

A. Factual Background

S.T. was born on April 12, 1993. Immediately after his birth, the Department of Human *592 Services (DHS) became involved in his welfare because both S.T. and his mother, S.J.T., tested positive for illicit drugs. Representatives of DHS met with the mother and established a plan whereby she would keep custody of S.T. and attend a drug counseling program. Apparently, however, the mother did not adhere to her obligations under this plan.
In January 1994, S.J.T., who was then pregnant again, was the victim of an assault and was taken to Howard University Hospital for treatment. While still in the hospital, S.J.T. gave birth to C.T. on February 7, 1994. Once again, both mother and child tested positive for drugs. The mother was discharged on February 9, but the baby was still in uncertain health and had to remain in the hospital. He was pronounced medically ready for discharge on February 16; however, as late as February 22, neither S.J.T. nor C.M.J., the acknowledged father, had had any contact with the infant, despite their knowledge that he had been ready to leave the hospital almost a week earlier.
On March 7 DHS removed C.T. from the care of his mother and placed him and his older half-brother, S.T., together in a foster home. Thereafter DHS filed identical neglect petitions for each child, alleging (1) that they had been abandoned; (2) that they were "without proper parental care and control necessary for [their] physical, mental, and emotional health," and that their situation was not due to a lack of financial resources; and (3) that the parents were unable to care for the children because of "physical and mental incapacity," namely, drug abuse and incarceration. The petitions named appellant C.M.J. as the father of C.T. and declared that the father of S.T. was unknown.[2] They stated that at the time of the children's births, the mother and both children tested positive for drugs, including cocaine, barbiturates, PCP, and opiates. The petitions also alleged that S.J.T. and C.M.J. had acknowledged using cocaine and that the mother had admitted engaging in prostitution to obtain money to buy drugs.
In June 1994, Sina Baktash, a social worker, was assigned by DHS to the children's case.[3] By this time, S.T. and C.T. had been sent to St. Ann's Infant Home, to a foster home, back to St. Ann's, back to the same foster home, back to St. Ann's, and finally to the home of new foster parents, Mr. and Mrs. M. Mr. Baktash met with both S.J.T. and C.M.J. and developed a case plan that included drug counseling, parenting classes, and assistance in seeking employment and housing. A visitation schedule providing for two supervised visits per week at the premises of Lutheran Social Services was also established.
In December 1994 C.M.J. entered into a stipulation with DHS and representatives for the children which stated in part:
4. As of March 1994, [C.M.J.] was unable to provide [S.T. and C.T.] with a safe and appropriate home because he was struggling with an addiction to cocaine.
5. Based on the foregoing, respondents are neglected children within the meaning of D.C.Code § 16-2301(9)(C) (1989 Repl.).
6. [C.M.J.] is now recovering, and the District intends to recommend that both boys go with [C.M.J.] as soon as he obtains a suitable residence and maintains a drug-free lifestyle. The District or one of its contract agencies will make all reasonable efforts to assist [C.M.J.] to locate and obtain such a home.
On December 5 the trial court accepted the stipulation and granted the neglect petitions with respect to both children.
On January 24, 1996, after almost two years of limited progress toward rehabilitation and reunification with the children, the guardian ad litem for S.T. and C.T. moved the court for an order terminating the parental *593 rights of S.J.T. and C.M.J. See D.C.Code § 16-2354 (1997). After both parents filed oppositions to the motion, the court scheduled an evidentiary hearing.
C.M.J. testified at the hearing that he had a high school diploma and attended Washington Technical Institute (now part of the University of the District of Columbia) for two and a half years. He has never been arrested. After he left school, he worked as an assistant manager for a hotel in suburban Maryland and then as a district manager for a video rental chain. He also worked briefly for a large department store, and at the time of the hearing he was employed as a night-time janitor. Before S.J.T.'s current incarceration, C.M.J. had lived with her off and on for more than six years.
C.M.J. is divorced from his first and only wife. He has a son who lives in Texas with that son's mother, and two other children, aged ten and six at the time of the hearing, as well as an adult stepchild, all of whom live in the Washington area. He has no contact with his ten-year-old son, but maintains good relations with the others.
C.M.J. testified that he would like to have custody of S.T. and C.T., but if that is not possible, he would want a relative to adopt them so that he could remain part of their lives. He said that he believed he could get himself together but "wouldn't try to put a time frame on it." C.M.J. also told the court that he hoped to continue his relationship with S.J.T., even though to an outsider that relationship might appear to be "somewhat rocky, I guess."[4]
Sina Baktash testified about both parents' history with the child welfare authorities. In December 1994, Baktash said, C.M.J. completed an alcoholic rehabilitation program, and around the same time he obtained housing and a job, and started to attend parenting classes. S.J.T., on the other hand, rarely attended the alcohol program, did not obtain a job or housing, and did not attend any parenting classes.
According to Mr. Baktash, C.M.J. visited regularly with both children, and their visits went very well. Mr. Baktash felt that C.M.J. knew how to control the children when they had tantrums; he showed them affection, and they called him "Dad" or "Daddy." S.J.T., however, rarely visited with the children, and when she did, the quality of the visits was poor. "The children were hesitant to go to her and . . . she got offended and hurt by that . . . ."
Mr. Baktash testified that in March 1995 C.M.J. and S.J.T. moved into a house together. The house was provided to C.M.J. rent-free by his cousin on the condition that C.M.J. refrain from using drugs. The children were not returned to C.M.J. at that time because he did not have any furniture for them, but he was given permission to have unsupervised visits with them. S.J.T.'s visits still had to be supervised, but that was of little significance because she had not seen the children since December 1994.
In July 1995 Mr. Baktash met with C.M.J. several times to discuss plans for reunification with the children. Mr. Baktash told C.M.J. that he was worried about S.J.T.'s presence in the house, since she was not undergoing drug testing or attending any counseling classes. Other issues of concern included the lack of beds for the children and C.M.J.'s job as a janitor, which required him to work at night. In an effort to provide regular child care, Mr. Baktash arranged for the children to be enrolled at the National Children's Center during the daytime, when C.M.J. would be sleeping, and C.M.J.'s cousin agreed to care for the children at night.
Plans for reunification of C.M.J. with the children came to a halt in late October 1995 when C.M.J.'s cousin discovered that C.M.J. was using drugs again and made him leave the house.[5] C.M.J., still intent on reunification, agreed to attend Narcotics Anonymous meetings, but he refused to enroll in a one-month inpatient program because he feared *594 that his absence from work would cause him to lose his job. C.M.J. had been employed at this job for over two years and had attained some seniority, which entitled him to medical insurance and other benefits.
In November 1995 Mr. Baktash, S.J.T., and C.M.J. agreed that the children should be adopted, but S.J.T. and C.M.J. opposed their adoption by anyone other than a relative. C.M.J. suggested his stepmother, who lived in North Carolina, as a possible adoptive parent. The stepmother agreed to take the children on the condition that C.M.J. come to North Carolina and help with their care. C.M.J. initially agreed to relocate to North Carolina, but later he changed his mind and refused to go. C.M.J. told Mr. Baktash that he decided not to move to North Carolina because he feared he would be unable to find work there, and he did not want to move to an area where he lacked a support network of relatives.
After the North Carolina plan fell through, other avenues of adoption were explored. S.J.T.'s maternal grandmother in Florida expressed an interest in adopting both children, and S.J.T. said she would consent to that, even though she had not seen her grandmother in eleven years. Mr. Baktash agreed that if a home study conducted by Florida welfare authorities was favorable, he would recommend that the grandmother be allowed to adopt the children.[6] S.J.T. suggested her other grandmother as another option, but this grandmother, who was already caring for an older daughter of S.J.T., refused to take on the additional burden of two small boys.
Mr. Baktash expressed the opinion that a TPR order would be in the best interest of the children because he did not know how long it would take C.M.J. to become ready to care for them, and he feared they might languish in foster care. Baktash observed that by April 1996 C.M.J. had stopped making progress toward reunification and seemed content with simply visiting the children and maintaining the status quo. Mr. Baktash noted that the children needed permanency and that their foster parents, Mr. and Mrs. M., were not likely to seek adoption because the foster father was in the Army, and the family had to move too often to assume permanent responsibility for the two boys. Mr. Baktash said that the children were "very adoptable" because they were still quite young, though he admitted that their being "developmentally delayed" could make finding an adoptive home "somewhat" more difficult. Finally, Mr. Baktash testified that S.T. and C.T. were well bonded to each other and that it was DHS policy to make every effort to place these two half-brothers in an adoptive home together. DHS was aware, in fact, that Lutheran Social Services had been in contact with prospective adoptive parents looking to adopt two children.

B. The Trial Court's Order

About a month after the hearing, in a ten-page written order, the court concluded "that termination of parental rights of both [S.J.T.] and [C.M.J.] is in the best interest of the children . . . ." The court made extensive findings of fact, which we here summarize in pertinent part.
First, the court found that S.J.T. had continued to abuse drugs and engage in prostitution and had not demonstrated any interest in caring for either child. "At the time of the hearing she was incarcerated . . . and had not visited the children in over a year." On the other hand, despite a drug relapse in November 1995, C.M.J. had made continuous efforts toward rehabilitation, including drug treatment, parenting classes, and employment, and had maintained a consistent interest in caring for both children. However, he had been unable to secure suitable housing for them and had not taken steps to shield the children from their mother's "dangerous, drug-addicted lifestyle."
Second, the court found that after C.T.'s birth, despite his being medically ready for *595 discharge, neither S.J.T. nor C.M.J. attempted to take custody of C.T.
Third, blood tests established that C.M.J. was not the biological father of S.T.
Fourth, the court found that S.J.T. had failed to have consistent contact with the children and that the children preferred to be with C.M.J. His "interactions with the children are excellent; he is able to handle their tantrums and he shows affection."
Fifth, S.T. and C.T. have had continuous care from foster parents, but the current foster parents were not interested in adopting them. "Due to young age and good health, despite some cognitive delays and developmental delays in speech for which they receive therapy, these children are very adoptable." The two boys get along well together, and Lutheran Social Services was "already aware of prospective adoptive families that have requested two children."
Finally, because C.T. and S.T. were only two and three years old at the time of the hearing, it was not feasible to ascertain their opinions as to what might be in their best interests. Accordingly, the court did not take this factor into account in reaching its decision.

II
We address the issue of standing first. Counsel for the children has moved to dismiss C.M.J.'s appeal in S.T.'s case (No. 96-FS-873) on the ground that, because C.M.J. is not S.T.'s biological father and has no other legal relationship with S.T., he does not have standing to contest the TPR order. We agree and grant the motion to dismiss the appeal as to S.T.
By statute, an appeal may be taken to this court only by a party "aggrieved by an order or judgment" of the Superior Court. D.C.Code § 11-721(b) (1995); see Briggs v. United States, 597 A.2d 370, 375 (D.C.1991). Although the statute does not define "aggrieved," we have often said that "the words of [a] statute should be construed according to their ordinary sense and with the meaning commonly attributed to them." Peoples Drug Stores, Inc. v. District of Columbia, 470 A.2d 751, 753 (D.C.1983) (en banc); see also, e.g., Rider v. United States, 687 A.2d 1348, 1352 (D.C.1996); Tesfamariam v. District of Columbia Dep't of Consumer & Regulatory Affairs, 645 A.2d 1105, 1108 (D.C. 1994). Following this principle, we construe "aggrieved," as used in D.C.Code § 11-721(b), to mean "suffering from an infringement or denial of legal rights." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 41 (1976). Thus an appellant has standing to appeal from an order of the Superior Court only if his legal rights have been infringed or denied by that order. See Briggs, supra, 597 A.2d at 375. In this case, because C.M.J. is not S.T.'s biological father, he has never had any parental rights as to S.T. Consequently, the TPR order, insofar as it pertained to S.T., did not and could not terminate any of C.M.J.'s rights; indeed, as between S.T. and C.M.J., the order is a nullity. We hold accordingly that C.M.J. is not an aggrieved party, and that he lacks standing to appeal from the TPR order insofar as it relates to S.T.
The effect of an order terminating the parent-child relationship is statutorily defined as follows:
[A TPR order] divests the parent and the child of all legal rights, powers, privileges, immunities, duties and obligations with respect to each other, except the right of the child to inherit from his or her parent. The right of inheritance of the child shall be terminated only by a final order of adoption.
D.C.Code § 16-2361(a) (1997). The TPR statute does not expressly distinguish between natural parents and putative parents; however, the legislative history "[makes] clear that the only parental rights at issue under the statute are those of the natural parent." In re Baby Girl D.S., 600 A.2d 71, 84 (D.C.1991).
In In re T.M., 665 A.2d 207 (D.C.1995), the trial court was asked to terminate the parental rights of a mother and two men, each of whom had been named by the mother (at different times) as the child's father. The court granted the petition with respect to the mother but denied it as to the putative fathers "for lack of proof." The court ruled *596 that because a putative father's rights cannot be resolved without establishing paternity, any rights of the two putative fathers should be addressed in a subsequent adoption proceeding. Both the child (through counsel) and the District of Columbia appealed, arguing that the parental rights of the two putative fathers should have been terminated because they were both properly served and given an opportunity to be heard.
On appeal this court held that the trial court had abused its discretion and reversed its order, but not on the ground urged by the appellants. We declared that the nature and purpose of the TPR statute suggested that the rights of a putative parent  e.g., the right to notice of the TPR proceedings and an opportunity to be heard (which is not at issue in this case)  "are among those covered by the statute." Id. at 210. This is not to say, however, that a putative but unproven father has enforceable parental rights. Rather, we held in T.M. that the relationship of parent and child must be established before that relationship can be terminated, and that a putative father therefore has a right to be a party to the TPR proceeding  but only for the purpose of being heard on the issue of paternity. Id. at 211 (the putative father has the right to assert "his biological relationship to the child and [to grasp] his opportunity interest to develop a relationship with his child"). Then, if paternity is in fact established, he has rights with respect to the child that may be the subject of a TPR order. See id. at 211-212.
Unfortunately, the T.M. case is of no help to C.M.J. because the record already establishes his non-paternity, see note 2, supra, and the trial court made a finding, not challenged on appeal, that he is not S.T.'s father.[7] Therefore, the TPR order respecting S.T. does not cause C.M.J. to suffer any loss or infringement of his legal rights. Because C.M.J. is not S.T.'s father, he never had any parental rights as to S.T. in the first place, and thus he has no standing to appeal from the TPR order. See In re Lomax, 386 A.2d 1185, 1187 (D.C.1978) (en banc) (hospital superintendent could not appeal from trial court's order releasing a patient because he was not a party aggrieved by the order); In re Estate of Jacobson, 387 A.2d 590, 591 (D.C.1978) (appeal by executor of estate dismissed because executor was not aggrieved by the challenged order); cf. In re Sippy, 97 A.2d 455, 458-459 (D.C.1953) (parent cannot waive child's right to appeal from juvenile detention order because child is the party aggrieved). Moreover, since S.J.T., the mother, has not challenged the TPR order respecting S.T., the order must stand without review. See, e.g., Lynn v. Lynn, 617 A.2d 963, 970 (D.C.1992) (failure to appeal from trial court order within prescribed time raises jurisdictional bar to appellate review of that order).
The appeal in S.T.'s case, No. 96-FS-873, is therefore dismissed because appellant lacks standing to appeal from the TPR order in that case.[8] Parts III, IV, V, and VI of this opinion pertain only to the appeal in C.T.'s case, No. 96-FS-872.

III
"A trial court may terminate a parent-child relationship when it determines, on the basis of the evidence presented and after due consideration of the interests of all parties, that the termination is in the best interest of the child." In re U.S.W., 541 A.2d 625, 626 (D.C.1988) (citing D.C.Code § 16-2353(a)); see also In re A.B.E., 564 A.2d 751, 755 (D.C.1989). There are six statutory factors for the court to consider: (1) the need for continuity of care and caretakers; (2) the physical, mental, and emotional health of the child, and of others involved with the child to the degree that it affects the welfare of the child; (3) the quality of the child's interaction with relatives and foster parents; (4) whether the child was abandoned in a hospital after being born; (5) the child's opinion of his own best interests, if it can be ascertained; and (6) any drug-related activity in the child's home environment. D.C.Code § 16-2353(b); *597 see In re U.S.W., supra, 541 A.2d at 626; In re K.A., 484 A.2d 992, 995 (D.C.1984).
A finding that termination of parental rights is in the best interest of the child must be supported by clear and convincing evidence. D.C.Code § 16-2359(f) (1997); see Santosky v. Kramer, 455 U.S. 745, 769-770, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). Accordingly, the party seeking termination must provide evidence that will "produce in the mind of the trier of fact a firm belief or conviction" that termination of parental rights is in fact in the best interest of the child. In re M.M.M., 485 A.2d 180, 183 n. 3 (D.C.1984); see also In re A.B.E., supra, 564 A.2d at 755 (petitioning party bears burden of proof).
Trial court rulings come to us with a presumption of correctness. Stockard v. Moss, 706 A.2d 561, 567 (D.C.1997); Wright v. Hodges, 681 A.2d 1102, 1106 (D.C.1996); Cobb v. Standard Drug Co., 453 A.2d 110, 111 (D.C.1982). Absent any indication to the contrary, we presume that the trial judge knew the proper standard of proof to apply and did in fact apply it. Wright, 681 A.2d at 1105 (citing Walton v. Arizona, 497 U.S. 639, 653, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990)). C.M.J. contends that, in ruling on the TPR petitions, the trial court did not apply the proper standard of proof. He correctly states in his brief that "the standard of proof in termination of parental rights cases in the District of Columbia is clear and convincing evidence." He fails, however, to identify just what standard he believes the court used or to say why he believes the court did not use the clear and convincing standard, and for that reason we must reject his argument. The trial court's order enumerates the statutory factors it considered, makes detailed factual findings, applies the statutory factors to those findings, and explicitly declares that it "finds by clear and convincing evidence that termination of parental rights . . . is in the best interest of the children." Cf. In re K.J.L., 434 A.2d 1004, 1007 (D.C.1981) (affirming TPR order despite court's failure to specify the standard of proof applied). On this record we hold that appellant has failed to overcome the presumption of correctness. See Wright v. Hodges, supra, 681 A.2d at 1106; In re L.H., 634 A.2d 1230, 1234 n. 8 (D.C.1993) (affirming TPR order when "appellant merely asserts, without substantiation, that the statutory factors for termination ... were not met by clear and convincing evidence"); United States v. Harris, 141 U.S.App. D.C. 253, 256, 437 F.2d 686, 689 (1970) (holding that appellant failed to overcome presumption of correctness when "nothing [in the record] . . . suggest[ed] that the court did not properly measure the burden of proof and all relevant factors").

IV
Appellant contends that termination was inappropriate because there was no evidence presented that an adoptive home for both children was available. This contention misunderstands the statutory scheme and, moreover, has been expressly rejected by this court in the past. E.g., In re A.R., 679 A.2d 470, 479 n. 15 (D.C.1996); In re P.D., 664 A.2d 337, 339 (D.C.1995), cert. denied, 519 U.S. 1017, 117 S.Ct. 531, 136 L.Ed.2d 417 (1996); In re A.W., 569 A.2d 168, 170-171 (D.C.1990).
It is in a child's best interest to be integrated into a "stable and permanent home," D.C.Code § 16-2353(b)(1), and in many instances that goal can be accomplished only by adoption. "If a child is adoptable, then adoption is the statutorily preferred plan, for the goal of permanency planning `is to end the uncertainty of foster care and allow the dependent child to form a long-lasting emotional attachment to a permanent caretaker.'" In re L.L., 653 A.2d 873, 888 (D.C. 1995) (citation omitted). Residual parental rights often dissuade prospective adoptive parents from pursuing adoption because they may be forced to assume an active adversary role with the child's natural parents. See In re A.W., supra, 569 A.2d at 171 (citation omitted); see also In re C.A.P., 356 A.2d 335, 338 (D.C.1976) (prospective adoptive parents may be unwilling to petition for adoption if outcome is dependent upon court fight). Therefore, when a child is found to be neglected, the court is authorized to "[t]erminate the parent and child relationship for the purpose of seeking an adoptive placement for *598 the child . . . ." D.C.Code § 16-2320(a)(6) (1997) (emphasis added). Conditioning termination of parental rights on the identification of adoptive parents or an adoptive home would thus appear to be inconsistent with the purpose and the plain language of the statute. In re A.W., 569 A.2d at 171 ("The overarching goal of [this provision] was to create as hospitable an environment as possible for potential adoptive parents of neglected children").
We therefore reject appellant's argument that a prospective adoptive placement was required before the court could enter a TPR order.[9]

V
The determination of whether the best interests of the child are served by terminating the parental rights of the natural parents is "confided to the discretion of the trial court." In re L.L., supra, 653 A.2d at 880. In reviewing the court's decision, "we check to be sure that the trial court has exercised its discretion within the range of permissible alternatives, based on all relevant factors, and no improper factor." In re R.M.G., 454 A.2d 776, 790 (D.C.1982) (citation omitted); accord, e.g., In re A.S.C., supra note 9, 671 A.2d at 947. We have held that the availability of a fit family member willing to assume legal custody of the child is one relevant factor. In re Baby Girl D.S., supra, 600 A.2d at 83-84. We have also held that "a parent's choice of a fit custodian must be given `weighty consideration' that can be overcome only by `clear and convincing evidence' that the proposed custodial relationship is `clearly contrary to the child's best interest."' In re F.N.B., 706 A.2d 28, 29 (D.C.1998) (citing In re T.J., 666 A.2d 1, 11 (D.C.1995)).
In the instant case, both parents made clear that they wanted a relative either to adopt or to maintain custody of the children. Three possible custodians were suggested: C.M.J.'s stepmother in North Carolina and S.J.T.'s two grandmothers, one in Florida and the other in the Washington area.[10] On the basis of the evidence, the court was able to find that C.M.J.'s stepmother and S.J.T.'s local grandmother were not viable options. However, the court could not make any finding with respect to the Florida grandmother because it did not have any evidence addressing her fitness as a custodian for the children. See note 6, supra. All that the court had before it was evidence that the Florida grandmother had expressed an interest in adopting the children, that S.J.T. would consent to such an adoption, and that the social worker conditionally recommended that she be allowed to adopt the children. See D.C.Code § 16-2353(a) (judge must rely on "evidence presented"). We conclude, given the precedents of T.J. and F.N.B., that the trial court erred in failing to give the requisite "weighty consideration" to the parents' preference that the children be placed in the custody of a relative. This is not to say that the parents' preferences are necessarily controlling. See In re F.N.B., 706 A.2d at 32; In re T.M., 665 A.2d at 952 (affirming TPR order despite mother's contrary proposal that custody be transferred to a great-aunt). Rather, we merely hold that the parents' preferences are entitled to further exploration than was undertaken here.

VI
There is a second, independent reason for a remand. In In re Adoption of Carlos, 413 Mass. 339, 350, 596 N.E.2d 1383, 1389 (1992), the court recognized that termination *599 of parental rights is an "extreme step" which requires consideration of possible future developments. Accordingly, the court held that, "in weighing the question whether parental rights are to be irrevocably terminated, it is appropriate for a judge to consider whether, on the basis of credible evidence, there is a reasonable likelihood that the parent's unfitness at the time of trial may be only temporary." Id. Although we have embraced this holding, In re L.L., supra, 653 A.2d at 389 n. 34, we have not abandoned our general disapproval of the "wait and see" approach. Id. at 887; see also In re S.C.M., 653 A.2d 398, 406 (D.C.1995) ("[p]rotracted retention in temporary foster care is generally not in a child's interest"); In re M.M.M., supra, 485 A.2d at 186. However, because there is often a concern that termination may be premature, see In re A.W., supra, 569 A.2d at 176-177 (Rogers, C.J., dissenting), the court must satisfy itself that the possible benefits of termination clearly outweigh the costs of deferring a decision. See In re L.L., 653 A.2d at 887 (TPR should be ordered only upon showing of "clear necessity," and "courts are expected to exercise restraint before ordering such relief" (citations omitted)); In re A.S.C., supra, 671 A.2d at 951 n. 14; see also In re L.W., 613 A.2d 350, 353 n. 6 (D.C.1992) (court "should do [its] best to obtain all of the information needed to effect a judicious disposition").
The evidence in this case suggested, at least, that C.M.J. might be on the road to becoming a fit parent despite his past history of drug abuse and instability. He had a steady job as a janitor and had held it long enough to acquire some seniority benefits. Furthermore, although the presence of S.J.T. in his home was a cause for concern, it was not shown that she would be living there permanently. On this record, and given the permanent nature of a TPR order, we think the court should have more explicitly considered the possibility that C.M.J. might become a suitable parent within the foreseeable future, and that in the meantime C.T. might remain in foster care, despite its obvious drawbacks.
[Although] judges are not required to inventory all the evidence and explain how they weighed each evidentiary item in reaching their decisions ... [they must make findings that] are detailed enough to allow a reviewing court to conclude that the decision "followed rationally" from the findings of fact ... and is consistent with the requirements of the law.
In re I.B., 631 A.2d 1225, 1232 (D.C.1993) (citations omitted). In the instant case, the court heard evidence demonstrating that C.M.J. was intent on rehabilitating himself so that he could be reunited with both children and that he had made some progress toward this goal. The court acknowledged this evidence but failed to make any findings on the likelihood that C.M.J.'s unfitness might be only temporary.
Therefore, given our standard of review, we cannot sustain the TPR ruling and must remand the case for further consideration.[11] We impose no restrictions on the remand proceedings. "All of [the issues we have discussed] and any others the trial court may deem relevant in determining the best interests of the child are left open for further development and consideration on remand." In re F.N.B., supra, 706 A.2d at 32.

VII
More than two and a half years have now passed since the TPR hearing, an enormous span in the life of a young child. Our record does not reflect any intervening changes in C.T.'s family situation,[12] mental and emotional needs, or attitudes toward his own family status and his future. In addition, we recognize the obvious fact that, by dismissing the appeal in S.T.'s case, we now create an exceedingly delicate situation, in that there is a greater possibility than there was before that S.T. and C.T. may be separated. Accordingly, *600 in partially vacating the TPR order as to C.T. and remanding the case to the trial court, we expect the court on remand to explore these developments and any relevant changes in the status of C.T. or other interested parties. Nothing we say in this opinion should be read as precluding any effort by the court to keep these two children from being separated. We leave it to the discretion and creativity of the trial court to decide whether that is a feasible goal and, if so, to craft an order that will achieve it.
In No. 96-FS-872, that portion of the TPR order which terminates appellant's parental rights with respect to C.T. is vacated, and the case is remanded for further proceedings. In No. 96-FS-873 the appeal is dismissed because appellant is not the biological father of S.T., nor does he have any other legal status with respect to S.T., and therefore he lacks standing to challenge the TPR order as to S.T. The portion of the order that terminates the parental rights of the children's mother, S.J.T., shall remain undisturbed, since she has not appealed from it as to either child.
It is so ordered.
NOTES
[1] The mother has not appealed from the TPR order.
[2] At the hearing below, the following exchange occurred between the children's guardian ad litem and appellant:

Q. Are you the biological father of S.T.?
A. From the testing that came back, I wasn't. Sina Baktash, a DHS social worker, testified that appellant was "the father that [S.T.] has known all his life, but the blood test determined that [appellant] was not the father. So he's not the biological father." There was no evidence identifying the actual father of S.T.; as far as the record discloses, his paternity is unknown.
[3] Mr. Baktash was the third DHS social worker on the case.
[4] S.J.T., the mother, gave very little substantive testimony at the hearing. She told the court that she was twenty-eight years old and incarcerated, and that she wanted a relative to adopt S.T. and C.T.
[5] A drug test on November 28, 1995, revealed that C.M.J. had used drugs again. The record contains no information about any tests thereafter.
[6] At the time of the hearing, Mr. Baktash had not yet heard from the Florida welfare authorities. Some time later, however, he was informed that, after a home study, they had concluded that the maternal grandmother was not an appropriate adoptive resource for S.T. and C.T. because of her advanced age (seventy-three). This report from Florida was not made part of the record until after the TPR order was entered, and thus it was never considered by the court.
[7] This fact is implicitly conceded by C.M.J. in his brief, which states that C.M.J. is "trying to regain custody of his own son C.T. and to eventually adopt S.T."
[8] Appellant would, of course, have standing to contest the finding that he is not the child's father, but he has not disputed that finding. See note 7, supra.
[9] Of course, in determining whether the drastic measure of terminating parental rights is required in the child's best interest, the court must consider the adoptive prospects of the child along with other relevant factors. See In re A.B.E., supra, 564 A.2d at 755. Indeed, we have declined to uphold a TPR order when the potential adverse psychological effect on the child of severing the legal relationship between parent and child outweighed very minimal prospects for the child's adoption. See In re A.S.C., 671 A.2d 942, 951 (D.C.1996); In re A.B.E., 564 A.2d at 756-757. Our holding today is not intended to depart from these principles.
[10] The court also heard evidence that C.M.J.'s cousin was willing to assist with the children's care, but it did not explore whether she was a likely custodian. See In re A.R., supra, 679 A.2d at 476.
[11] But see In re U.S.W., supra, 541 A.2d at 627-628 (Rogers, C.J., concurring) (when natural parent, despite good relations with child and efforts at self-improvement, has been unable to overcome his own problems, termination is in the best interest of the child).
[12] At oral argument, however, counsel represented to the court that S.T. and C.T. have been living together in a prospective family home for almost two years.