**In re TW.P., T.P., K.P., L.P. and T.F., Appellants.**

Nos. 98–FS–1149, 98–FS–1150, 98–FS–1151, 98–FS–1152, 98–FS–1153, 98–FS–1154.

District of Columbia Court of Appeals.

Argued Feb. 15, 2000.

Decided July 27, 2000.

---

R. René Dupuy, Washington, DC, for appellant, L.P.

Paul E. Nystrom, Jr., New York City, NY, for appellant, T.F.

Christopher May for appellees.

Before SCHWELB and WASHINGTON, Associate Judges, and PRYOR, Senior Judge.

WASHINGTON, Associate Judge:

The sole issue on appeal is whether there was sufficient evidence in the record to terminate the parental rights of L.P. ("mother") and T.F. ("father") (collectively, "appellants"). On January 3, 1995, the guardian ad litem for appellees, K.P., T.P., and Tw.P., filed motions to terminate the parental rights of L.P. and T.F. After a hearing conducted on March 26 and March 28, 1996, the trial court issued an order terminating appellants' parental rights. On February 17, 1998, appellants' motion to vacate and reopen the termination of parental rights (TPR) hearing was granted and a supplemental hearing was held on March 13 and March 19, 1998. On April 24, 1998, the trial court again issued an order terminating appellants' parental rights, and timely appeals were filed in this court. Appellants argue on appeal that the trial court's decision to terminate their parental rights was not supported by clear and convincing evidence. We discern no error with the trial court's ruling, and thus we affirm.

## I.

Tw.P., T.P., and K.P. are the children of L.P. and T.F. Tw.P. and T.P. are sisters born on August 31, 1986, and August 2, 1988, respectively. Their brother, K.P., was born on June 12, 1989. At the time the mother entered a stipulation of neglect on April 7, 1992, the children were five, three and two years of age, respectively.

This case first came to the attention of the District of Columbia Department of Human Services ("DHS") when the shelter facility where L.P., Tw.P., T.P., and K.P. were residing contacted the agency to report that L.P. had left the children alone on several occasions. Although the case was referred to Laraine Adams, a DHS social worker, on July 4, 1991, nothing came of the matter until September 1991, when the shelter facility contacted DHS requesting a placement for the three children because L.P. had been arrested for stabbing her boyfriend. Since L.P. was unable to care for the children because of her legal difficulties, DHS sought an interim placement. At that time, the three children were placed in the home of their birth father, T.F., and his mother J.F. However, after two weeks, the children were returned to DHS because the house was too small to accommodate both the children and J.F.'s daughter who had been shot and was convalescing in the home. At that time, DHS suggested that T.F. enter a shelter with his children to wait for

a permanent housing placement. However, T.F. decided against entering a shelter with the children.

In November of 1991, the children were placed with a maternal cousin, S.B. However, they were removed from the home and placed in foster care in December 1991 because S.B.'s boyfriend burned Tw.P. on her finger for allegedly stealing, while S.B. held her hand over an open flame.

Although L.P.'s legal troubles were apparently resolved around this time, DHS felt that she was still unable to care for the children. A major concern for DHS was that L.P. did not have permanent housing and had been evicted from several shelters because of her violent relationships with men. In addition, all of the children evidenced special needs and exhibited behavioral problems. Tw.P. had the most severe problems of the three children and is described as a very difficult, emotionally disturbed child. For this reason, Tw.P. was placed in a therapeutic day nursery at the age of five and a half. T.P. also had emotional needs, but was also described as a very happy, talkative, and outgoing girl. K.P. had a speech problem and special education needs at the time he entered the foster care system.

On April 7, 1992, L.P. entered into a stipulation of neglect conceding that she was unable to care for the children. DHS set up a reunification plan with L.P. that required her to participate in a parenting program and a counseling program. Her other obligation was to maintain contact with the social worker. Ms. Adams testified that the mother did not follow through with the reunification plan. As an example, Ms. Adams related that although L.P. made an initial appointment for counseling, she did not follow up on the appointment. Ms. Adams also testified that L.P. continued to be involved in abusive relationships with men, most times with M.R., the boyfriend she had previously stabbed. In addition, despite having liberal visitation rights, L.P. failed to maintain regular contact with the children. There were several occasions where L.P. would totally disappear and could not be reached at any of her known contact numbers.

Ms. Adams testified that T.F. also rarely visited the children. In fact, T.F. visited the children only twice from the time they entered foster care until May of 1993. However, the father's few visits were described as positive. He apparently responded well to the children, particularly to K.P. At some point T.F. expressed an interest in having the children live with him. He had moved out of his mother's house and was living with his girlfriend, A.J., and her three children. Ms. Adams testified that although A.J. appeared pleasant, the home in which they were living was very small and unsuitable for six children. Ms. Adams testified further that some comments by T.F.'s mother, although she could not recall the substance of the comments, raised some concern in her mind regarding the stability of the relationship between T.F. and A.J. and their ability to care for children with special needs. Finally, because T.F. did not have a stable income and rarely visited with the children, placement of the children with him was not seen as a viable alternative.

Between October 1993 and April 1994, L.P.'s living arrangements remained unstable, and her visits remained sporadic. By this time, she had additional children, and according to Mr. Benoy Thomas, the new DHS social worker assigned to the case, she would contact him to request diapers for her younger children, transportation tokens, emergency food assistance, and day care services, but never expressed a strong desire to become reunited with her older children. Despite her apparent lack of motivation, DHS again developed a reunification plan for her. This plan included a mental health evaluation, which she completed; counseling for her abusive relationships with men, which she refused; parenting classes, which she completed but reportedly did not benefit from; and housing, which she applied for but never received. L.P.'s visits did increase in fre-

quency to twice a month from December 1993 until February 1994. However, in February 1994, L.P. again disappeared and no further arrangements for visitation were made until April 1994.

When visitation did resume, L.P. brought along a friend, V.H. She also brought along two of her younger children. During the visits, L.P. was described as distant from the respondents, she did not interact well with them; she simply sat and observed T.P. and K.P. play. Mr. Thomas unsuccessfully attempted to show L.P. how to talk and play with the children. According to Mr. Thomas, T.F. also visited with the children during this time frame and interacted well with the children, talking and playing, and engaging them throughout the visitation period. He would also bring something for the children when he visited. However, Mr. Thomas believed that T.F. acted more like a friend than a father to the children.

Although the goal was reunification when Mr. Thomas was assigned the case, the goal was changed to adoption in April 1995. It was decided that despite efforts to provide L.P. with the services necessary to remedy her parenting deficiencies, she had made little progress towards reunification. DHS believed that she lacked an understanding of the special needs of the children, and because she had two other children and was pregnant with another child, she would not be able to provide for the needs of the respondents. Mr. Thomas testified that at that time he believed that the respondents had bonded with their foster parents and that the foster parents might be willing to adopt them. Mr. Thomas also testified that T.F. had acknowledged that he was unable to care for the children and would not disagree if the foster parents wished to adopt the children.

The children were subsequently transferred to the foster care adoption unit in October 1994, where efforts were made to have them permanently placed with their foster parents. During this process, a court order prohibited future visitation by the appellants. It was believed that the visits caused the respondents' behavior to regress, thereby, hurting their chances for adoption. Around this same time, T.F. expressed an interest in having his relatives visit with the children in the hope that a relative would eventually take custody of the children. However, nothing came of the efforts to find a relative placement, and DHS continued to move forward with the proposed foster care adoptions. Eventually, however, the foster care families decided not to adopt the children, and the goal for the respondents was switched back to reunification.

In August 1995, Ms. Laurel Mage was appointed to the children's case. She testified that at that time all three of the children were placed with V.H., a family friend of L.P. Initially, L.P. lived in a separate apartment owned by V.H. and visited with the children in V.H.'s home. However, in September of 1995, she moved into V.H.'s home and was living with the children. V.H.'s household was described as clean and the children were neat, clean, well-dressed, orderly, and studied their school work. However, in November 1995, L.P. moved out of V.H.'s house, taking her younger children, and leaving the three children under DHS supervision with V.H. At some point relatively soon thereafter, L.P. accused V.H. of abusing the children. Although Ms. Mage ultimately determined that the accusations were meritless, the children were removed from V.H.'s care because of threats by L.P. to kidnap the children.

Ms. Mage also testified that when she received the case, she attempted to contact T.F. by mail, but received no response. At that time, she believed K.P. and T.P. certainly could be adopted, but that Tw.P. needed to remain in a residential placement. Further, Ms. Mage stated that she did not consider reunification of the children with L.P. appropriate because she was an inappropriate parent, and did not believe T.F. was a viable option because he

did not express an interest in having custody of the children.

In addition to the testimony of DHS social workers, which also included the testimony of Augustine Ekwen, the trial court heard testimony from Ms. Barbara Brandeen, Tw.P.'s special education teacher, and Irena Sarovic, Tw.P.'s therapist. Their testimony was consistent with that of the DHS social workers with regard to Tw.P.'s emotional difficulties as well as her interaction with appellants.

The government also presented the testimony of Katherine Jacobs, a psychologist in private practice. She testified that after reviewing the psychiatric and psychological evaluations of L.P., Tw.P., T.P., and K.P., it was her opinion that Tw.P.'s emotional disorders appeared to be due to her instability and feelings of being rejected but that if Tw.P. became emotionally stable, she could be moved to a regular school. She described T.P. as physically healthy with high anxiety that caused her to act out, and K.P. was described as borderline retarded in his cognitive development with symptoms of post-traumatic stress disorder. Ms. Jacobs stated that the childrens' various emotional difficulties could be treated if they had a stable home environment and continuity. She found it particularly pertinent that the three children had not lived with their mother for five years and were desperately in need of belonging to a loving family. She expressed her belief that as long as the parents' rights were not terminated and they remained in the children's lives, the children would not be able to achieve the needed stability. Ms. Jacobs further testified that the children needed to be adopted and that long term foster care was only suitable until the children began to understand that the relationship between them and the foster parents is not permanent. Lastly, she testified that once the natural parents' rights were terminated, the children could be prepared for adoption, including learning that they were going to be adopted, beginning the search for parents who would commit despite knowing their problems, as well as continuing their therapy to address their emotional needs.

The March 13, 1998, continuation of the TPR hearing specially addressed the issue of the adoptability of the children and their current placements. At the time of the hearing the children were eleven, nine, and eight. The record reflects that all three children were under therapeutic care with Progressive Life Center. Cheryl Berlack–Parker, clinical supervisor of the Nia Program, the therapeutic foster care program at the Progressive Life Center, testified that Tw.P. had improved significantly while in their care and was able to contain a lot of the problematic behavior she used to display. Ms. Berlack–Parker testified that if Tw.P. was adopted by someone other than her then foster parent, Ms. Jones, she would go through a period of regression, but that Tw.P. was psychologically strong enough to recover if she could form a bond with the new person. In addition, Ms. Berlack–Parker stated that it would be detrimental for Tw.P. to be reunited with her mother because she would assume a parenting role and feel responsible for her actions, and she would not be able to develop herself toward adulthood. Ms. Berlack–Parker testified that Tw.P.'s chances of being adopted were lessened because of her age, but that termination of the natural parents' parental rights was a necessary step to improve her chance of obtaining a stable environment.

Charlene Edwards, a clinical social worker for Progressive Life Center, testified that she had worked directly with T.P. since July of 1996, and that T.P. had also progressed a great deal emotionally. Ms. Edwards testified that T.P.'s current foster mother, Ms. Crockett, liked being a foster parent and was not interested in adopting T.P., but that T.P. has many strengths and was a very good candidate for adoption. Finally, Ms. Edwards expressed that if the appellants' rights were terminated DHS would begin to identify a pre-adoptive home in which to place T.P.

In addition to her testimony regarding T.P.'s progress and adoption prospects, Ms. Edwards also offered that L.P. continued to have problems with abusive relationships, and that in August of 1997, she contacted Child Protective Services and requested that they come and take her five-year-old child whom she could no longer control. Because the child was placed with his father, there was no finding of neglect by L.P.

Nathan E. Bovelle, K.P.'s clinical social worker with Progressive Life Center, testified that he works with K.P. regarding his behavior at school and at home. Mr. Bovelle stated that K.P. is psychologically ready for adoption, but it has not been considered since the natural parents' rights have not been terminated. He also stated that K.P.'s current caretakers, Mr. and Mrs. Davis, have committed to long term foster care of K.P. but have not talked about adoption.

In response to the government's evidence, L.P. testified that she had not been allowed to see her children in two years. She conceded that she was not ready for reunification but believed that she would be ready to take care of the children in another year. She stated that she wants to see the children and has always wanted to be their mother and take care of them. L.P. also expressed her belief that the government, the Progressive Life Center, and the various social workers have prevented her from reuniting with her children. T.F. failed to appear for the hearing, but was represented by counsel who argued that T.F.'s parental rights should not be terminated because the government failed to prove by clear and convincing evidence that terminating his rights would be in the best interest of the children.

**II.**

■ "A trial court may terminate the parent-child relationship when it determines, on the basis of the evidence presented and after due consideration of the best interest of all parties, that the termination is in the best interest of the child." *In re C.T.*, 724 A.2d 590, 596 (D.C.1999) (citing *In re U.S.W.*, 541 A.2d 625, 626 (D.C.1988); D.C.Code § 16–2353(a)). The trial court's decision to terminate parental rights must be supported by clear and convincing evidence that termination is in the best interest of the child. *See In re C.T.*, 724 A.2d at 597. "Clear and convincing evidence is most easily defined as the evidentiary standard that lies somewhere between a preponderance of evidence and evidence probative beyond a reasonable doubt." *In re J.M.C.*, 741 A.2d 418, 423 (D.C.1999) (citations omitted). Or, more simply put, "the party seeking termination must provide evidence that will 'produce in the mind of the trier of fact a firm belief or conviction' that termination of parental rights is in fact in the best interest of the child." *In re C.T.*, 724 A.2d at 597 (citations omitted). "[I]n reviewing the court's decision we check to be sure that the trial court has exercised its discretion within the range of permissible alternatives, based on all relevant factors, and no improper factor." *In re C.T.*, 724 A.2d at 598 (internal citations omitted). We are also guided by the standard that the trial court's determination of where the best interest of the child lies may be reversed only for an abuse of discretion. *In re J.M.C.*, 741 A.2d at 423 (citation omitted).

**III.**

■ D.C.Code § 16–2353(b)[1] provides for the weighing of six factors in determin-

1. (1) the child's need for continuity of care and caretakers and for timely integration into a stable and permanent home, taking into account the differences in the development and the concept of time of children of different ages;

(2) the physical, mental and emotional health of all individuals involved to the degree that such affects the welfare of the child, the decisive consideration being the physical, mental and emotional needs of the child;

ing whether termination of parental rights is in the best interest of the child.[2] This court has also articulated that there are three specific purposes underlying the termination of parental rights statute: "(1) to encourage stability in the life of the neglected child; (2) to ensure the recognition and enforcement of the constitutional rights of all parties; and (3) to increase the opportunities for *prompt* adoptive placement." *In re A.S.C.*, 671 A.2d at 951 (citations omitted) (emphasis added). On this record, we hold that the extensive findings of facts and conclusions of law issued by the trial court are supported by clear and convincing evidence, and thus, we affirm the termination of the parental rights of L.P. and T.F. pursuant to D.C.Code § 16–2353. Because the mother and the father lived apart and T.F. did not serve as a custodial parent for any significant period of time, we will separately address the evidence presented against the mother and the father in this case.

*The Mother—L.P.*

The evidence in the record indicates that L.P. was the custodial parent when the children were first brought into the neglect system. At that time, L.P. and the children were living in a shelter and she acknowledged in a stipulation of neglect

that she was unable, at that time, to care for them. Over the next seven years L.P. failed to take the steps necessary to foster reunification with T.P., Tw.P., and K.P., instead choosing to have several additional children for whom she was unable to provide. Specifically, L.P. refused counseling to address her continuing relationships with abusive men, and wholly failed to: 1) fully participate in parenting classes; 2) regularly visit with her children; 3) keep in contact with her social workers; and 4) establish any permanent housing arrangements suitable for her children.

In addition to the testimony regarding L.P.'s inability or unwillingness to address her needs or respondents' needs for stability and continuity of care, there was significant testimony that after visiting with her, the children's behavior and emotional health deteriorated and the children's conduct became a problem in their foster homes and at school. In particular, after visits with their mother, T.P. would curse and Tw.P. would develop a clear pattern of destroying things. By way of contrast, there was evidence presented that after an amount of time passed and the children did not interact with their mother, their behavior would improve and they would become mentally and emotionally stable. Thus, the evidence supports the court's

(3) the quality of the interaction and interrelationship of the child with his or her parent, siblings and/or caretakers, including the foster parent;

(4) the child was left by his or her parent, guardian, or custodian in a hospital located in the District of Columbia for at least 10 calendar days following the birth of the child, despite a medical determination that the child was ready for discharge from the hospital, and the parent, guardian, or custodian of the child has not taken any action or made any effort to maintain a parental, guardianship, or custodial relationship or contact with the child;

(5) to the extent feasible, the child's opinion of his or her own best interest in the matter; and

(6) evidence that drug-related activity continues to exist in a child's home environment after intervention and services have been provided. . . .

2. A review of the record indicates that the evidence presented at the hearing relating only to subsections (1), (2), and (3) of D.C.Code § 16–2353(b), are relevant to this case. Subsection (4) simply does not apply. With respect to subsection (5), the record is inconclusive. There is no clear indication from the children regarding the petition's merits. Finally, although the trial court considers subsection (6) in its findings, there is no competent evidence in the record as to whether drug-related activities continue to exist in the home. There were no indications of drug abuse by either parent, and the only information in the record is a comment made by T.P. that on one occasion she remembers seeing her mother and a friend smoking something the trial court apparently believed were not cigarettes.

finding that "the children are healthier psychologically and emotionally when they do not have contact with [the mother]."

Furthermore, there was testimony by several DHS officials that the quality of the mother interaction with the children was poor when she visited with them. Their collective testimony indicates that L.P. did not know how to engage the children, that she would sit and observe them but would not interact with them. There was also testimony that L.P. did not know how to initiate conversations with the children and that her limited interaction with the children was inappropriate and demonstrated a lack of understanding of the special needs of the children. Furthermore, there was evidence that L.P. never attempted to foster a relationship between the respondents and her other children, despite bringing her younger children along on visits.

In addition to the evidence regarding the needs of the children, the destructive influences the mother had on the children, and her lack of intimacy with the children, the government introduced unrebutted testimony that the mother was not adequately caring for her younger children who were not, at the time of the hearing, part of the neglect system. According to the testimony of Mr. Thomas, the mother contacted DHS and requested that DHS come and take one of her other children whom she could not control. Eventually this child was placed with his father. On the last visit DHS made to the mother's home, they discovered that three of her children were in the care of the godmother throughout the week and that she only provided care at all times for one of her children.

*The Father—T.F.*

Because the father was only minimally involved in the lives of his children, and because he failed to appear for the hearing, the government's evidence necessarily focused on the mother and her ability to provide a stable and permanent home for the children. Significantly, the trial court apparently did not consider the father to be "actively" contesting the termination of his parental rights primarily because he failed to appear for the hearing.[3] Given the trial court's determination that the children's best interest would be served by their integration into a "stable and permanent home" and given the substantial evidence in the record to support the court's finding that T.F. is unable to provide such stability, we are unable to say that the trial court's order terminating T.F.'s parental rights was unsupported by clear and convincing evidence in the record. *Id.*

The record with respect to T.F. reveals that he was not a particularly active nor involved parent. In fact, it would be generous to describe him as a "non-custodial parent" since the term parent connotes some meaningful involvement in a child's life, and the sad facts of this case begin with his three children living in a shelter, often without proper adult supervision, and at times without sufficient food. Even after DHS caused T.F. to become involved in the lives of his children, he was never able to secure fulltime employment and financially support the children or provide a stable and permanent home for them. In addition, there was testimony that for significant periods of time, he either failed to visit the children or failed to visit them consistently. Finally, the only evidence in the record that T.F. was emotionally con-

---

3. This seems evident from the trial court's factual findings that concentrate almost exclusively on the mother, and only by footnote suggest that the court's findings apply equally to the father. The trial court's order expressed that T.F. wished to "maintain contact with his children" and that "it has not been suggested that he is in a position to be considered as a placement resource"; but "it is L.P. who is actively contesting the instant motion [to terminate parental rights]." Additionally, the trial court comments in a footnote that the children are deemed an "at risk" adoption because "at least one birth parent is contesting the termination of rights," the implication of which is that both parents were not contesting termination of their parental rights.

nected to any of the children was testimony that Tw.P. was disappointed if either parent missed a scheduled visit.

Although there was some evidence introduced that T.F. made an effort to care for his children after DHS initially contacted him, that effort as well as other subsequent expressions of interest ended with T.F. ultimately being unable to provide a stable home or consistent emotional support for his children. For example, in September of 1991 when the children were first brought into the neglect system, he originally agreed to care for the children. However, he soon thereafter returned the children to DHS because his living situation would not accommodate them, and he would not agree to stay with the children in a shelter. In 1993, T.F. again offered to take custody of the children. At that time he was living with his then girlfriend, A.J., in a two bedroom apartment. However, because A.J.'s three children were also living in the two bedroom apartment, DHS believed that it would be an inappropriate placement for T.F.'s three children, especially given their special needs. On yet another occasion, T.F. suggested that he could care for K.P., that Tw.P could be placed with his mother, and that T.P. could be placed with his maternal aunt. Although the record does indicate that his mother may have reluctantly agreed to provide such care, if necessary, the record is silent as to whether T.F.'s maternal aunt agreed to care for any of the children. Regardless, because neither of the proposed caretakers came forward, DHS officials evidently did not consider those placements viable. More importantly, the record is silent regarding T.F.'s efforts to follow up on his suggestion that DHS place K.P. with him. What we do know from the record is that K.P. was not placed in

his father's care at or around that time. According to DHS, during the seven years that the children were in the neglect system, T.F. was given several housing referrals and offered other assistance but he was never successful in putting himself in a position to care for the children. In addition to testimony regarding his inability to secure stable employment and adequate housing to care for the children, T.F.'s occasional visits with the children, although viewed for the most part as positive, were generally described as more of a visit between friends than a visit between a parent and his or her child.[4]

## IV.

Aside from the difficulties both of the appellants had in parenting these children, there was evidence presented that the children progressed emotionally and psychologically when they were apart from their natural parents in stable environments like those they enjoyed with their longer-term foster care families. This evidence was introduced through the testimony of the various social workers involved with the family over the seven-year history of the case as well as the testimony of Psychologist Katherine Jacobs. Their testimony amply supports the presumption underlying the statute that it is in a child's best interest to be integrated into a stable and permanent home. *See* D.C.Code § 16–2353(b)(1).

Finally, there was substantial testimony that all three children were suitable for adoption. Ms. Jacobs as well as the various social workers who testified all supported the conclusion that the children were adoptable. Although there was concern expressed about Tw.P.'s adoptability

---

4. We are mindful that the quality of the children's interaction with a parent must include some appreciation for the frequency of the parents' visits with the children. In this case, there were periods of time that the father did not visit or his visits were only sporadic and there were other periods of time that the father could not visit because of the court

ordered suspension of visits. Because the relationship between the father and the children was never a close one and the visits were more in the nature of a visit between friends, there is little or no evidence that emotional bonds were ever forged between the father and the children.

because of her emotional health, Ms. Jacobs testified that all of the children were physically healthy and that their mental and emotional problems were curable. Other evidence presented at the hearing indicated that the children possessed individual characteristics that outweighed the obvious concerns raised by their ages and special needs. While the trial court did not ignore the fact that the children's ages and special needs would make it difficult to find appropriate adoptive homes for the children, the trial court ultimately concluded the children were suitable for adoption.[5] Given the testimony developed at the hearing, the court's findings that the children were adoptable and would benefit from placement in a stable and permanent home was supported by clear and convincing evidence in the record.

Both L.P. and T.F. alternatively argue on appeal that the trial court erred in terminating their parental rights because no adoptive home had been located for the children. However, when a child has been found to be neglected, D.C.Code § 16–2320(a)(6) authorizes the court to "terminate the parent and child relationship for the purpose of *seeking* an adoptive placement for the child." Thus, this court has consistently held that conditioning termination of parental rights on the identification of adoptive parents would be inconsistent with the statute and has rejected arguments that a prospective adoptive placement is required before the court can enter a TPR order. *In re C.T.,* 724 A.2d at 597–98 (emphasis added).

**V.**

■ The sad reality is that neither L.P. nor T.F. is able to provide stability for their children and, unless their parental rights are terminated, these children have virtually no chance of securing adoptive placements that could provide them with the permanence and stability they so desperately need. In cases like this, where there is overwhelming evidence introduced that a child's best interest will be served by his or her prompt integration into a permanent and stable home, and no viable family placement is available, adoption is the preferred alternative. Because prospective adoptive parents are reluctant to consider an "at risk" adoption, where a natural parent may oppose and contest their adoption efforts, the termination of parental rights is critical to increasing the chances of adoption and consequently, to increasing the likelihood that the best interests of the children will ultimately be served. *See In re A.W.,* 569 A.2d 168 (D.C.1990). The trial court's order terminating the parental rights of L.P. and T.F. is amply supported by clear and convincing evidence. Accordingly, we affirm.

*So ordered.*

---

5. A pertinent portion of the trial court's order reads as follows:

Furthermore, the record indicates that unless the motion is granted, the children are deemed an "at risk" adoption. As such, it would be very difficult, if not impossible, given their age and history of the case, to secure an adoptive placement. Thus, unless the parental rights are terminated, the children have no chance of adoption, and little chance of securing emotional and physical stability. It can all be concluded that, as older children, they will not have as easy a time finding an adoptive placement as a newborn. Nonetheless, the testimony establishes that they are suitable for adoption, and that the lack of permanency is not in their best interest.